# EXHIBIT 9

# AUTOMOTIVE BODY PARTS ASSOCIATION v. FORD GLOBAL TECHNOLOGIES, LLC

## JOSEPH TSAI

January 3, 2017

*Prepared for you by*



**NATIONWIDE COURT REPORTING & VIDEO**

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

JOSEPH TSAI
January 3, 2017

## Page 1

1      UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF MICHIGAN
2
   AUTOMOTIVE BODY PARTS          )
3  ASSOCIATION,                   )
                                  )
4       Plaintiff,      )Case No.
                        )2:15-cv-10137-LJM-MJH
5  v.                   )
                        )
6  FORD GLOBAL TECHNOLOGIES, LLC, )
                        )
7       Defendant.      )
8  _____
   FORD GLOBAL TECHNOLOGIES, LLC, )
9                       )
        Plaintiff,      )
10                      )Case No.
   v.                   )2:15-cv-10394-LJM-MJH
11                      )
   NEW WORLD INTERNATIONAL, INC.; )
12 AUTO LIGHTHOUSE PLUS, LLC; and )
   UNITED COMMERCE CENTERS, INC., )
13                      )
        Defendants.     )
14
   *********************************
15      VIDEOTAPED ORAL DEPOSITION OF
               JOSEPH TSAI
16            January 3, 2017
   *********************************
17     VIDEOTAPED ORAL DEPOSITION OF JOSEPH TSAI, produced
18 as a witness at the instance of the Defendant, and duly
19 sworn, was taken in the above-styled and numbered cause
20 on January 3, 2017, from 1:11 p.m. to 4:33 p.m., before
21 Rebecca A. Graziano, CSR, RPR, CRR, in and for the State
22 of Texas, reported by machine shorthand, at the offices
23 of DepoTexas, 6500 Greenville Avenue, Suite 560, Dallas,
24 Texas, pursuant to the Federal Rules of Civil Procedure
25 and the provisions stated on the record.

## Page 2

1            A P P E A R A N C E S
2
3  REPRESENTING THE PLAINTIFF:
4     Mr. Robert G. Oake, Jr.
      OAKE LAW OFFICE
5     825 Market Street, Suite 250
      Allen, Texas  75013
6     (972) 996-4777
      rgo@oake.com
7
8  REPRESENTING THE DEFENDANT:
9     Mr. Marc Lorelli
      Ms. Linda D. Mettes
10    BROOKS KUSHMAN, P.C.
      1000 Town Center, 22nd Floor
11    Southfield, Michigan  48075
      (248) 358-4400
12    mlorelli@brookskushman.com
      lmettes@brookskushman.com
13
14
15 THE VIDEOGRAPHER:
16    Mr. Jason Snyder

## Page 3

1            INDEX
2  Appearances..........................  2
3  JOSEPH TSAI
      Examination by Mr. Lorelli...................  7
4
5  Signature and Changes...........................  135
6  Reporter's Certificate...........................  137
7
          EXHIBITS
8
   NUMBER    DESCRIPTION                    PAGE
9
   Exhibit 1    Autolights, LLC, Color Photograph    20
10
   Exhibit 2    United States Design Patent    23
11               D496,890
   Exhibit 3    United States Design Patent    23
12               D495,979
13 Exhibit 4    Patent Numbers at Issue    46
14 Exhibit 5    New World Parts Records    46
15 Exhibit 6    Defendant's Objections and    65
                Responses to Ford Global
16              Technologies, LLC's, First Set of
                Requests for Admission
17 Exhibit 7    Ebay Listing    81
18 Exhibit 8    Ebay Listing    81
19 Exhibit 9    Ebay Listing    82
20 Exhibit 10   Ebay Listing    84
21 Exhibit 11   Ebay Listing    85
22 Exhibit 12   Ebay Listing    87
23 Exhibit 13   Ebay Listing    87

## Page 4

1              EXHIBITS
2  NUMBER    DESCRIPTION                    PAGE
3  Exhibit 14   Autolights, LLC, Color Photograph    96
4  Exhibit 15   2012 June Wholesale Catalog All    99
                Pricing

JOSEPH TSAI
January 3, 2017

---

Page 5

1      PROCEEDINGS
2            (On the record at 1:11 p.m.)
3            THE VIDEOGRAPHER:  We're now on the record.
4    This is the videotaped deposition of Joseph Tsai being
5    taken on January 3rd of the year 2017.  The time now is
6    1:11 p.m.
7            We're located at 6500 Greenville Avenue,
8    Suite 445, in Dallas, Texas 75206.  We're here in the
9    matter of Automotive Body Parts Association versus Ford
10   Global Technologies, LLC.  The case number is
11   2:15-cv-10137-LJM-MJH.  This matter is being held before
12   the Honorable Laurie J. Michelson in the United States
13   District Court, Eastern District of Michigan.
14           My name is Jason Snyder, videotape operator.
15           Will the court reporter swear in the
16   witness, and the attorneys briefly identify themselves
17   for the record, please.
18           (Witness duly sworn.)
19           MR. LORELLI:  I'm Marc Lorelli from Brooks
20   Kushman, P.C., on behalf of Ford Global Technologies,
21   LLC.  Also present with me is Linda Mettes from Brooks
22   Kushman.
23           MR. OAKE:  I'm Robert Oake from Oake Law
24   Office, Allen, Texas, representing Automotive Body Parts
25   Association, and New World International, Auto Lighthouse

---

Page 6

1    Plus, and UCC.
2            And did you -- I have a question.  You read
3    a caption.  Which -- did you read the caption for two
4    cases or one?
5            THE VIDEOGRAPHER:  Just one.
6            MR. OAKE:  Just one.  It's my understanding
7    the deposition is being taken in connection with both
8    cases; is that true?
9            MS. METTES:  Yes, both cases.
10           MR. OAKE:  Okay.  So perhaps we can provide
11   the video technician with the second caption as well.
12           And do you want me to state my objection?
13           MR. LORELLI:  That's fine.  I'll
14   just -- I'll -- the two case numbers upon which these
15   depositions are being taken in relation to the
16   functionality and patent exhaustion defenses, it's Case
17   Number 2:15-cv-10137 in front of Judge Michelson, and the
18   other is Case Number 2:15-cv-10394, also in front of
19   Judge Michelson.
20           You can place whatever you'd like on the
21   record now.
22           MR. OAKE:  Okay.  The Court has entered
23   orders in both cases that the parties are to place on the
24   record at the beginning of the deposition any objections
25   they have, and then the depositions will then be taken

---

Page 7

1    subject to these objections.
2            So I just want to make it clear for the
3    record that we have a motion to dismiss pending in the
4    Ford Global versus New World, et al., case based on
5    improper venue and lack of personal jurisdiction in other
6    matters.
7            And so we object to the deposition and to
8    discovery because we believe that venue is improper,
9    personal jurisdiction is improper, and we want to be
10   clear that we're -- that the parties are not waiving
11   their position that venue is improper and personal
12   jurisdiction is improper by participating and going
13   forward with these depositions.
14               JOSEPH TSAI,
15       having been first duly sworn, testified as follows:
16                EXAMINATION
17   QUESTIONS BY MR. LORELLI:
18     Q   Good afternoon, Mr. Tsai.
19     A   How are you doing, Marc?
20     Q   I'm good.  Thank you.
21         Now, you understand that you are here today
22   to provide testimony?
23     A   Yeah.
24     Q   In fact, you've been deposed several times
25   before; correct?

---

Page 8

1    A   Yes.
2    Q   And you understand you're here today as a
3    representative -- a 30(b)(6) rule representative of New
4    World International?
5    A   Yes, sir.
6    Q   And you are being offered as -- as the witness
7    to testify with regards to various topics at issue
8    currently in these cases?
9    A   Yes, sir.
10   Q   Are you familiar with Partslink, sir?
11   A   Somewhat.
12   Q   And what is your -- can you tell me what
13   Partslink is?
14   A   I know it's a numbering system that's generally
15   used in the aftermarket auto body parts industry.
16   Q   And what is -- you used the term "aftermarket
17   auto body parts industry."  What is an "aftermarket
18   part"?
19   A   An "aftermarket part" is, I guess, a generic
20   part, if you want to call it like that.
21   Q   And when you say "generic," what do you mean?
22   A   Well, I guess it would be -- I guess the
23   difference between, let's say, Tylenol and Equate, if
24   that makes sense.  Tylenol is the brand, and then Equate
25   is the generic.

---



JOSEPH TSAI
January 3, 2017

---

**Page 9**

1  Q    Okay.  What is a "performance part"?

2  A    I mean, I guess a "performance part" would be a

3  part that's different from what the original equipment

4  manufacturer looks like, and it can be designed for

5  several reasons, whether or not it's to change the shape

6  or the color of the vehicle.

7  Q    To change the look of the vehicle -- or the look

8  of the part?

9  A    Sure.  Sure.  I think that's a fair position.

10  Q    And New World sells certain performance parts?

11  A    Yes, we do sell, but not very much.  I'd say

12  maybe, like, 20, 30 units -- or 30 SKUs, rather.

13  Q    What is the main business of New World, if

14  performance parts are only 20 to 30 SKUs?

15  A    The distribution of aftermarket auto body parts

16  to collision repair shops or used car dealerships, new

17  car dealerships.

18  Q    And those parts that's the primary focus of New

19  World International's business is -- is what you called

20  the generic or the parts that are intended to look like

21  the OEM parts?

22  A    Yes.

23  Q    Why does New World International sell

24  performance parts?

25  A    It used to be a business back in the day with,

---

**Page 10**

1  like, the "Fast and Furious" and some of those new movies

2  that came out.

3           But then I'd say, especially with the

4  downturn in the economy, it just wasn't very popular

5  anymore.  And to this point, our firm doesn't feel like

6  it's very profitable to carry or distribute, and so, I

7  mean, what we have is just leftover stock.

8           But, I mean, point being, we don't

9  distribute that really -- we don't market it.  Let's put

10  it that way.

11  Q    Does New World International or any of the other

12  companies that you're involved with have any automotive

13  designers on staff?

14  A    No, sir.

15  Q    Has New World International or any of the other

16  companies that you've been involved with ever designed

17  the appearance of an automotive part?

18  A    No, sir.

19  Q    Now, you're aware that Ford and the other

20  original equipment manufacturers employ automotive

21  designers that create the appearance and look of parts;

22  right?

23  A    Yes, sir, if you say so.

24  Q    Well, do you know that?  I mean, you're in the

25  automotive industry.

---

**Page 11**

1  A    As far as I know, yes.

2  Q    Okay.  And in fact, every few years, those OEMs

3  change the looks of their parts and their products in the

4  marketplace; right?

5  A    Yes.

6  Q    Why do they do that?

7  A    I would -- I don't know.  I mean, I guess to

8  build a new design or something that people like or find

9  aesthetically appealing, something to that effect.

10  Q    And they hope that that would increase sales;

11  right?

12  A    Sure.

13  Q    Now, you, as a representative of the -- you're

14  on the board of the ABPA.  Is that still true?

15  A    Yes, sir.

16  Q    Did you have any involvement in the earlier

17  cases involving Ford design patents against LKQ and

18  Keystone?

19  A    No, sir.  I had knowledge of it, but I was never

20  involved.

21  Q    Okay.  What -- how did you acquire this

22  knowledge of it?

23  A    Just by working in the industry, word of mouth,

24  discussions with different management executives.

25  Q    Okay.  And do you have knowledge that Ford is

---

**Page 12**

1  able to obtain design patents for automotive designs that

2  are new and nonobvious?

3  A    Can you repeat the question, please?

4  Q    Sure.

5           Do you have an understanding that Ford is

6  a -- strike that.

7           When Ford creates a new part design, are you

8  aware that Ford is able to obtain a design patent if that

9  design is new and nonobvious?

10  A    As far as I know.

11  Q    And you do know that Ford has patents on various

12  parts; right?

13  A    Alleged, right.  But --

14  Q    Well --

15  A    -- I mean, I guess we're -- I'm not waiving the

16  fact that I think it's valid.  Now, obviously, we don't

17  think they're valid.  But as long as we understand that.

18  Q    Yes.

19  A    Okay.

20  Q    Okay.  The patent office has given Ford design

21  patents on a number of its parts; right?

22  A    Yes.

23  Q    And there's also parts that Ford does not have

24  design patents on; correct?

25  A    As far as I know.

---



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOSEPH TSAI
January 3, 2017

---

## Page 13

1    Q    Parts that might not have made the threshold of
2    the patent office requirements for design patentability;
3    fair?
4        A    I -- I didn't research that.  But if you're
5    telling me so.
6        Q    Well, do you sell parts for Ford vehicles that
7    are not covered by design patents?
8        A    I don't -- I don't know.  I mean, I -- we -- we
9    didn't investigate whether or not --
10       Q    Okay.  Now, back to -- back to Partslink.
11           Partslink identifies which parts are covered
12   by design patents, doesn't it?
13       A    Yes and no.  I mean, I know that Partslink's
14   data denotes something that says whether or not they
15   believe that that item is patent.  But I also know that
16   with parts and numbers, that they can fit various
17   vehicles, models, so forth.
18       Q    Okay.  Would you say that you know that -- you
19   said Partslink, they identify parts that they believe
20   have design patent coverage?
21       A    Yes.
22       Q    When you say "they," who's the "they"?
23       A    I couldn't tell you definitively who's
24   determining that.
25       Q    Um-hum.

---

## Page 14

1        A    But Mark Shin is the one who manages Partslink.
2        Q    And who is Mark Shin?
3        A    He is a contractor with telemark software, and
4    they are a firm that helps to manage Partslink database
5    on behalf of the ABPA.
6        Q    Is the Partslink database an ABPA, I guess,
7    database?  Is that who runs it and updates it?
8        A    ABPA owns it.
9        Q    Owns it.  Okay.
10           And what was the name of the company that
11   Mark Shin worked for?
12       A    Telemark software.
13       Q    And where is -- do you know where that's
14   located?
15       A    I believe in San Diego.
16       Q    Okay.  And the Partslink database also
17   identifies if there is a performance part associated with
18   a particular OEM part; right?
19       A    I couldn't say that definitively either.  I
20   mean, I'd say that they're -- they're denoting that, but
21   I don't know the nature of the performance part --
22       Q    Okay.
23       A    -- when they say "performance."
24       Q    When -- okay.  So you understand that the
25   Partslink database does say that a performance part is

---

## Page 15

1    associated with a certain OEM part; you just don't know
2    the details or whether it's accurate?
3        A    Fair.
4        Q    Okay.  So when the Partslink database notes a
5    performance part associated with an OEM part, what is it
6    intended to convey to people like you at New World?
7        A    I think it's intended to convey that it could
8    fit on a particular vehicle.
9        Q    Okay.  It could fit; right?  It could also -- if
10   it's a headlight, it could function; is that fair?
11       A    I don't know how -- it depends on how you define
12   "function."
13       Q    Would the light turn on?
14       A    Yes.
15       Q    If it was a headlamp, the light would turn on?
16       A    Yes.
17       Q    Okay.  If it was a taillamp, the taillamp would
18   turn on?
19       A    Yes.
20       Q    That's what I mean by "function."
21       A    Fair enough.  Yes.
22       Q    Okay.
23       A    It -- it would turn on.
24       Q    It would just look different; correct?
25       A    Yes.

---

## Page 16

1        Q    Look different from the OEM design?
2        A    Yes.
3        Q    Do you -- are you aware of any companies that
4    make performance parts?
5        A    I was aware of some in the past, but, I mean,
6    there might be some that have a few here and there, but I
7    couldn't tell you with certainty.
8        Q    But in the past, you knew of companies that made
9    performance parts?
10       A    Yes, sir.
11       Q    And did you know that those companies also
12   designed those parts?
13       A    I don't know that for a fact.  Maybe they did;
14   maybe they didn't.  But if they didn't, they probably
15   paid someone to do it.
16       Q    Paid an automotive designer to create an
17   aesthetically pleasing design?
18       A    Sure.
19       Q    And that's something that New World
20   International does not do; correct?
21       A    Yes.
22       Q    Now, in your -- what do you call your industry?
23   The aftermarket industry?
24       A    Sure.
25       Q    Automotive aftermarket industry?

---



JOSEPH TSAI
January 3, 2017

## Page 17

1  A  Yes, sir.
2  Q  How many years have you been in that industry,
3  you personally?
4  A  I've worked formally for 11 years, but on and
5  off during the summers in my teen years.
6  Q  Okay.  So in those 11 years, you've come to
7  understand that automotive OEM manufacturers change part
8  designs on a regular basis?
9  A  When you say "regular basis," how often are
10  you --
11  Q  Sometimes every other year; sometimes every
12  three, four years; sometimes every five or six years?
13  A  Sure.
14  Q  And sometimes, like, if we're talking about a
15  particular vehicle -- say, for example, the Ford
16  F-150 -- all the parts may be redesigned in any
17  particular model year.  Are you aware of that?
18  A  I don't know about all the parts, but the
19  vehicle.
20  Q  Okay.  So the -- when the vehicle is completely
21  redesigned, typically all the parts will be redesigned;
22  right?
23  A  I don't know that I agree with the parts are
24  being redesigned.  I mean, the parts fit on the vehicle,
25  and the vehicle is one design by itself.

## Page 18

1  Q  So let's take --
2  A  I mean, it's -- do you know what I'm saying?
3  It's not like -- it's not like someone looks at the hood
4  and says, "That's aesthetically pleasing."
5  They have to look at the vehicle and say
6  that, "That's aesthetically pleasing."
7  Q  Okay.  They can't just look at the one part?
8  A  No, sir.
9  Q  You can't do it?
10  A  Well, I mean, they can look at it.  But the
11  point I'm trying to tell you is that no one would look at
12  the part independently and say that that part by itself
13  was aesthetically pleasing.
14  The way that that part fits and mates on to
15  a vehicle and how that vehicle itself looks is what makes
16  it aesthetically pleasing.
17  Q  Okay.  Let's take, for example, headlamps.  Are
18  you aware, from time to time, that automotive
19  manufacturers may just change the aesthetically pleasing
20  design of a headlamp without changing anything else?
21  A  You'll have to tell me an example.
22  Q  In your time in the after -- automotive
23  aftermarket, are you not aware of that fact?
24  A  I mean, you could probably find an example, but
25  I couldn't think of one off the top of my head.

## Page 19

1  Q  I'm not -- I'm not asking you for an example.  I
2  mean, do you know that that happens; that, for example --
3  A  No, I don't.
4  Q  Okay.  So you -- you're not aware of any
5  situation where an automotive company would simply change
6  the design of their headlamp from one model year to the
7  next?
8  A  Not as far as I'm aware of.  I mean, if you can
9  get me an example, I can certainly look at it, though.  I
10  just don't know of one off the top of my head.
11  Q  Okay.  Would it surprise you if automotive
12  designers make those types of changes at a part level?
13  A  I mean, maybe they could or maybe they couldn't.
14  I don't know.  I mean, you're asking me something that I
15  don't know.
16  Q  And obviously you -- you know about it because
17  you've been -- as you've been testifying here today and I
18  think some of our earlier depositions, but you're here
19  today as a 30(b)(6) on these two issues of functionality
20  and patent exhaustion --
21  A  Yes.
22  Q  -- amongst other details that we have in our
23  notice.
24  But for functionality, what is the function
25  that you claim that Ford's patented designs serve?

## Page 20

1  MR. OAKE:  Object to form.
2  THE WITNESS:  I don't -- could you ask the
3  question a different way?
4  Q  BY MR. LORELLI:  Sure.
5  For your functionality defense, what is the
6  function that you claim that Ford's design patents serve?
7  A  The function is the design.
8  Q  Meaning the look of the part; correct?
9  A  Yes, the aesthetic appeal.
10  MR. LORELLI:  Can we mark this, please, as
11  New World Exhibit 1?
12  (Tsai Exhibit 1 was marked.)
13  Q  BY MR. LORELLI:  Mr. Tsai, last time I was here
14  you told me about a company called Autolights, LLC, in
15  Michigan.
16  Do you recall that?
17  A  Yes, sir.
18  Q  And they're a company that you do some business
19  with?
20  A  We don't currently.  But, I mean, I think we
21  bought one order from them maybe.
22  Q  Okay.  You buy -- I think -- and I could be
23  wrong, but what did -- what did you buy from them?
24  A  I can't remember.
25  Q  That's fine.



JOSEPH TSAI
January 3, 2017

## Page 21

1       Let me show you what I've marked as
2   Exhibit 1, which is a photograph from one of their
3   websites.
4       A   Okay.
5       Q   And it says here, quote:  "These new Explorer
6   headlights look way different than the current model.
7   The LED bar is a nice touch."
8           Do you see that?
9       A   Yes, sir.
10      Q   Does that indicate to you that Ford just changed
11  the headlamps between the model years on the -- on its
12  Ford Explorer?
13      A   I mean, I don't know what the -- what they're
14  comparing it to, I mean, but sure.
15      Q   And at least this individual from Auto
16  Lighthouse, LLC, noticed that part of the design?
17      A   Sure.
18      Q   And noticed that the, quote, "headlamps look way
19  different," close quote; right?
20      A   Yes, sir.
21      Q   As a -- just like a consumer would see the
22  design of a headlamp as being something perhaps
23  desirable; right?
24      A   Sure.
25      Q   The same way that a consumer might look at a

## Page 22

1   hood or a fender and come to the same conclusion; right?
2       A   As it looks on the vehicle, right; not
3   independently, but as it looks on the vehicle, sure.
4       Q   Okay.  So when you take a headlamp off the
5   vehicle, when you take this headlamp off that's in the
6   image of Exhibit 1, and you take the old Explorer
7   headlamp, or the current model Explorer
8   headlamp -- headlamp off the vehicle, when those are off
9   the vehicle, they still look different, don't they?  They
10  don't look like each other?
11      A   Well, I don't know.  When -- when this person is
12  referencing "these new Explorer headlights look way
13  different than the current model," are they saying the
14  current model, meaning this is a new model?  Because he's
15  saying -- when he says "new Explorer headlights," I don't
16  know if that means that it's a new Explorer altogether
17  and it's changing the whole body.
18      Q   Okay.  Well, an Explorer is a fairly high volume
19  car; right?
20      A   Yes, sir.
21      Q   You're familiar with that because it's in the
22  automotive aftermarket; right?
23      A   Reasonably.  I don't necessarily know what they
24  look like, but...
25      Q   And you sell Explorer headlamps?

## Page 23

1       A   I believe so.
2       Q   Ones that look like these?
3       A   I couldn't tell you definitively.
4           MR. LORELLI:  Let me mark as Exhibit 2
5   and 3 a couple of patents here.
6           (Tsai Exhibits 2 and 3 were marked.)
7           THE WITNESS:  Are we looking at 2 or 3
8   first?
9       Q   BY MR. LORELLI:  We'll look at both of them
10  together, but first I'll just put them into the record.
11      A   Okay.
12          MR. LORELLI:  As Exhibit 2, we've marked
13  US Patent Number 496,890, and for Exhibit 3, we've marked
14  US Patent Number D495,979.
15      Q   BY MR. LORELLI:  Okay.  And these are -- you
16  recognize both of these as vehicle grilles?
17      A   Yes, sir.
18      Q   Do you, sir?
19      A   Yes, sir.
20      Q   Okay.  Now, in fact, I believe the '890 patent
21  is one of the ones in suit.
22          Do you know that or --
23      A   Yes.
24      Q   Okay.  The '979 patent is not in suit.  Okay?
25      A   Okay.

## Page 24

1       Q   These -- each of these grilles has a different
2   aesthetic design; correct?
3       A   Yes.
4       Q   And the inventors of the '890 grille designed
5   that grille to have a certain aesthetic appearance;
6   right?
7       A   Yes.
8       Q   That they want it to be aesthetically pleasing
9   to a consumer; right?
10      A   Yes.
11      Q   Okay.  And the inventors of the '979 grille
12  created that grille to have an aesthetic appearance;
13  right?
14      A   Yes, sir.
15      Q   And they also hope that that aesthetic
16  appearance would be attractive to consumers?
17      A   Yes.
18      Q   Okay.  The patent office awarded both of these
19  patents in the year 2004.  Okay?
20      A   Okay.
21      Q   Do you see that up at the top?
22      A   Yes, sir.
23      Q   Now, in 2000-- this is what I want you to
24  accept though:  In 2004, neither one of these grilles
25  appeared on a production Ford vehicle.  Okay?



JOSEPH TSAI
January 3, 2017

Page 25

1   A   If you're representing that to me.
2   Q   I'm telling you that --
3   A   Okay.
4   Q   -- as a fact.
5   A   Okay.
6   Q   Okay?
7   A   Okay.
8   Q   So if an aesthetically pleasing design that was
9   created by Ford designers and artists is not on a Ford
10  production vehicle, is it still invalid under your view
11  of functionality?
12  A   Yes.
13  Q   Okay.  So any automotive component designed by
14  Ford is invalid for functionality?
15  A   Yes.
16  Q   Why?
17  A   Because the design is its function.
18  Q   Okay.  So Ford can't create a valid design
19  patent, in your view?
20  A   Yes.
21      Well, let me think about that for a second.
22  Q   Sure.
23  A   So Ford can't -- can you say that again?  So
24  Ford can't design a valid design patent?
25  Q   Right.

Page 26

1   A   I'll never say never, but I don't think this is
2   valid.  I'll go that far.
3   Q   Okay.  Now, I'm asking you a different question.
4       The question that I asked you is that if
5   this design of Exhibit Number 2 never ended up on a Ford
6   vehicle, would it still be invalid, in your view?
7   A   I'm not an attorney, so I wouldn't know whether
8   or not it would valid or invalid.
9   Q   But you contend that Exhibit Number 2 is invalid
10  in this case as functional; right?
11  A   Yes.
12  Q   And I'm asking you whether the fact that Ford
13  uses it on its F-150 has an impact on that determination?
14  A   I mean, your -- your earlier point where you
15  said if it never ended up on a Ford vehicle, would that
16  make this patent invalid, but I don't know, like, if
17  other models would have come out between now and whatever
18  year you're implying that looked the same.
19      And, again, I'm not an attorney, but my
20  understanding is if somebody comes out with something
21  that looks just like that and they claim it and it's not
22  something that's actively being used, that there may or
23  may not be a valid patent on something like that.
24  Q   Okay.  Let me just back up to make sure we're
25  not talking past each other.

Page 27

1   A   Okay.
2   Q   You told me earlier that the function is the
3   aesthetic appeal -- the function is the design, it's the
4   aesthetic appeal of a certain part --
5   A   Yes.
6   Q   -- in your testimony?
7   A   Yes, sir.
8   Q   And you said that the part is used to return the
9   vehicle to its original appearance?
10  A   Yes.
11  Q   Right?
12      And it's the only part that can return the
13  vehicle to its original appearance; right?
14  A   Yes.
15  Q   If the design patent covered something that was
16  not the original appearance of any vehicle, would it
17  still be -- would it be subject to the functionality
18  attack that you're making in this case?
19  A   I am not an attorney, and I couldn't tell you
20  one way or the other.
21      MR. OAKE:  And object to form in that it's
22  a hypothetical.
23  Q   BY MR. LORELLI:  Can you tell me -- well, can
24  you think of any situation where Ford could design a
25  grille and that design patent could be valid?

Page 28

1   A   I -- I couldn't tell you one way or another.
2   Again, I don't know what qualifies or makes that -- that
3   particular patent valid, unless you have a specific
4   example like --
5   Q   Yeah, that's a fair point.
6       MR. OAKE:  Well --
7   Q   BY MR. LORELLI:  And let me narrow my question
8   because I'm only concerned with your functionality
9   assertion.
10      If Ford created a design patent that Ford
11  never used on any vehicle, could it still pass your
12  functionality invalidity challenge in this case?
13  A   I -- I don't know.  Can I look at it?
14  Q   Yeah, let's -- if you can just assume that
15  Exhibit Number 3 was never used on a Ford vehicle.
16      MR. OAKE:  Object: hypothetical.
17      THE WITNESS:  Is this -- is that what
18  you're representing to me, that this is -- this hasn't
19  been used on a vehicle?
20  Q   BY MR. LORELLI:  I'm asking -- that's the
21  question I'm asking.
22      MR. OAKE:  Same objection.
23      But you can answer it if you can.
24      THE WITNESS:  I couldn't tell you.
25  Q   BY MR. LORELLI:  Mr. Tsai, as you know, Ford



JOSEPH TSAI
January 3, 2017

Page 29

1    employs a lot of artistic designers; right?
2        A    Yes.
3        Q    Ford spends a lot of money in creating
4    aesthetically pleasing designs of Ford's vehicles; right?
5        A    Yes.
6        Q    And those designs are -- are created by the sum
7    of its parts, if you will; right?
8        A    Yes.
9        Q    Ford invests in -- have you seen automotive clay
10   modeling, where they basically sculpt cars out of clay?
11   Have you seen that?
12       A    Yes.
13       Q    And you've seen the attention to detail that
14   appears in automotive part designs; right?
15       A    Yes.
16       Q    Ford invests heavily in automotive design
17   because, as you've told me earlier in this deposition,
18   it's because people want to buy Ford products; right?
19       A    Sure.
20       Q    With that large investment, is there any ability
21   of a design patent to protect anything that Ford
22   designers do?
23       A    I don't know.
24       Q    You'll agree with me that a performance part is
25   an alternative part that can be used in place of an OEM

Page 30

1    part?
2        A    Yes, but not to return the vehicle to its
3    original condition.
4        Q    It can be used to fit the same location and
5    function the same way, but for looking like the OEM part;
6    correct?
7        A    Sure.
8        Q    So in your view, there can never be a part that
9    looks different and satisfies the function as you've
10   defined it; correct?
11       A    Yes.
12       Q    Is there anything that stops General Motors from
13   creating a headlamp design -- actually, strike that.
14            Let's go back to example -- or Exhibit
15   Number 2 there.
16            Is there anything that stops General Motors
17   from creating a grille design and using it like that
18   design that's depicted in Exhibit Number 2?
19       A    I don't know.
20       Q    So if General Motors wanted to use Ford designs,
21   it could; right?
22       A    I suppose so.
23       Q    General Motors could use the headlamp design of
24   the Explorer that we talked about earlier, if it wanted
25   to; right?

Page 31

1        A    I don't know, but I guess.
2        Q    Okay.  General Motors could --
3            MR. OAKE:  Well, let me say don't guess.
4    If you know --
5            THE WITNESS:  Okay.  I don't know.
6        Q    BY MR. LORELLI:  Sure.
7            General Motors could copy the grille design
8    of Exhibit 2 if it wanted to; right?
9        A    Yes.
10       Q    It has the ability to put that grille on a
11   computer reverse engineering machine and create an
12   identical copy; right?
13       A    I would think so.
14       Q    And General Motors could put that on the front
15   of its pickup trucks; right?
16       A    I would think so.
17       Q    If Exhibit 2 was -- well, strike that.
18            The design patent prevents Ford from
19   doing -- I'm sorry.
20            The design patent of Exhibit 2 prevents
21   General Motors from doing that; right?
22       A    I don't know.
23       Q    Well, if Exhibit 2 didn't exist, there would be
24   no prohibition against General Motors from copying that
25   part; right?

Page 32

1        A    I don't know.  I'm not -- I'm not General
2    Motors.
3        Q    Well, can General Motors infringe Exhibit
4    Number 2, legally?
5        A    I don't know.
6        Q    Can General Motors copy Ford designs and use
7    them?
8        A    I'm not sure.
9            I feel like that's kind of what we're here
10   to decide, isn't it?
11       Q    So you believe that General Motors should be
12   able to copy Ford's parts just like you want to do;
13   right?
14       A    Well, what I'm trying to tell you is I think
15   that's what this case is about.  That's what this case is
16   trying to determine; right?
17       Q    Now, what kind of car do you -- can you just
18   give me an example of a car that you have driven
19   recently?
20       A    I drive a Lexus GS 350.
21       Q    GS --
22       A    350.
23       Q    -- 350.  Okay.
24            On that vehicle, there are windshield
25   wipers; right?



JOSEPH TSAI
January 3, 2017

---

**Page 33**

1    A   Yes, sir.

2    Q   And you see them all the time, don't you --

3    A   Yes.

4    Q   -- when you turn on the windshield wipers?

5    A   Yes.

6    Q   Right?

7        Do you know what kind they are?

8    A   No.

9    Q   Do you know what they look like?

10   A   I have an idea, but I wouldn't know what the

11   difference between those or Ford windshield wipers or GM

12   windshield wipers are.

13   Q   Have you ever replaced the windshield wipers on

14   your car?

15   A   For an old car I had in high school.

16   Q   Okay.  And have you ever replaced them on your

17   Lexus GS 350?

18   A   No, sir.

19   Q   New car?

20   A   Relatively.

21   Q   Relatively.

22       And it doesn't rain that much here in Texas,

23   huh?

24   A   I'd say not for the most part.

25   Q   And no snow and ice?

---

**Page 34**

1    A   Not really.

2    Q   Us up north, we've got to replace our windshield

3    wipers a little bit more often, probably.

4        Now, does your company sell windshield

5    wipers at all?

6    A   No, sir.

7    Q   Are you familiar that there's an OEM market for

8    windshield wipers and an aftermarket for windshield

9    wipers?

10   A   Yes.

11   Q   Just like the parts you sell?

12   A   Yes, sir.

13   Q   You're aware of that?

14   A   Yes, sir.

15   Q   And the OEMs are the same ones that are on your

16   vehicle when you bought the vehicle; right?

17   A   Sure.  I mean, I haven't gone and looked at them

18   myself.

19   Q   And the O -- and the replacement ones are

20   different?  They're not like the ones that you put on

21   originally?

22   A   I don't know.

23   Q   If I had design patents on a windshield wiper,

24   would those patents be invalid as functional as well

25   under your view of the law?

---

**Page 35**

1    A   I -- I'm not an attorney.  I don't know.

2    Q   I'm trying to understand your position in this

3    case, which you're a 30(b)(6) deponent on the

4    functionality defense that you've asserted in this case?

5    A   Yes, sir.

6    Q   Does that defense eviscerate all design patents

7    on wiper blades as well?

8    A   I don't -- I don't know, because I think

9    windshield wipers are there to wipe your windshield.  But

10   I don't know how that changes in the argument that we're

11   talking about here.

12   Q   Okay.  So the function of a windshield wiper is

13   to wipe your windshield; right?

14   A   Yes, sir.

15   Q   Is it the function of a windshield wiper to look

16   like the windshield wiper that came off your car in the

17   first place?

18   A   I have no idea.

19       MR. LORELLI:  Actually, Mr. Tsai, why don't

20   we take a short break so I can organize my exhibits --

21       THE WITNESS:  Okay.

22       MR. LORELLI:  -- with my colleague here.

23       MR. OAKE:  Sure.

24       THE VIDEOGRAPHER:  We're off the record at

25   1:52 p.m.

---

**Page 36**

1        (Recess from 1:52 p.m. to 2:02 p.m.)

2        THE VIDEOGRAPHER:  We're back on the record

3    at 2:02 p.m.  Please continue.

4    Q   BY MR. LORELLI:  I think I might have gotten to

5    the point of our -- or at least my confusion.

6        You told me that the function that you're

7    asserting is the aesthetic appeal of a design, such that

8    it matches what came off the car originally.

9    A   Can you say that a little bit simpler?

10   Q   Yeah, yeah.

11       You said that the function that you're

12   claiming in this case is the aesthetic design -- the

13   function is matching the aesthetic design of what was on

14   the car before.

15   A   Yeah.  Its function is the design.

16   Q   Function is the design, but it's -- but it's the

17   design of what was on the car before; right?

18   A   Well, what was on the car before?

19   Q   The part that was taken off?

20   A   I'm not --

21   Q   Right?  You got a part that's taken off, and

22   then a new part put on; right?

23   A   Okay.

24   Q   That new part that's put on, you're saying the

25   design of that part has to look like the part that came

---



JOSEPH TSAI
January 3, 2017

Page 37

1  off?
2     A   Yes, sir.  Are you talking about a repair or
3  what are you --
4     Q   I'm talking about your functionality defense.
5     A   Okay.
6     Q   Right?
7     A   They have to look alike, yes.
8     Q   That's the focus of your functionality defense.
9  The parts have to look alike?
10    A   Yes.
11    Q   Okay.  And that's what you've defined as the
12  "function"?
13    A   Yes.
14    Q   Okay.  Now, I asked you earlier about designs
15  and whether they were never on cars; right?  But I'm
16  going to try to get back to that in a more streamlined
17  fashion.
18    A   Okay.
19    Q   Okay.  For your functionality defense, the -- if
20  the part looks like the part that came off the car, then
21  it's functional and the patent's invalid, right, in your
22  position?
23    A   The function is its design, and the patent is
24  invalid.
25    Q   Okay.  So now if the part going on is -- looks

Page 38

1  different than the part coming off or the part that was
2  taken off, that's okay; right?
3     A   Okay for what?
4     Q   It doesn't -- well, that's not fair.  Let me ask
5  that question in a better way.
6        Okay.  If the design -- well, we have design
7  patents that cover various automotive parts; right?
8     A   Sure, if that's what you're representing.
9     Q   Okay.  Well, do you believe that?
10    A   I think so.
11    Q   Okay.  When you sell an aftermarket Ford F-150
12  grille, your parts look like that part; right?
13    A   For this particular model?
14    Q   Yeah.
15    A   Yes.
16    Q   And for that -- for those -- for that particular
17  model, it looks like the design of Exhibit 2?
18    A   Yes.
19    Q   But your --
20    A   Well, no, no, no.  Actually, I believe that with
21  this design, the ones that we sell have quite a few more
22  columns than the ones that -- that's shown in this design
23  patent.
24    Q   Okay.  So your position is that Ford's design of
25  Exhibit 2 does not cover what's on the car?

Page 39

1     A   The part that we sell does not look like the
2  part in this diagram.
3     Q   Okay.  So why does -- how is that patent invalid
4  as functional?
5     A   Well, if -- well, I'm not sure about that
6  argument.  But I know that these don't look alike.  Like
7  this specific grille doesn't look like the one that we
8  sell, this one in the diagram.
9     Q   Okay.  So then explain to me how the design of
10  Exhibit 2 can be invalid as functional under your
11  position.
12    A   Well, they don't even look the same.
13    Q   So that one is not invalid as functional?
14    A   Well, I don't know about the invalid as
15  functional or whatever, but they don't look the same.
16  And because the design isn't the same, I don't think the
17  patent -- well, the patent isn't valid.
18        I'm sorry.  I feel like I'm getting a little
19  confused.
20    Q   You say that -- this is your position.  Your
21  functionality position is that Ford's design patents that
22  cover part designs are invalid as functional because the
23  part that you sell has to look like the design patent;
24  right?
25    A   Well, so they -- they're designed to look like

1  the OEM -- the OEM ones that you guys make.  But I don't
2  think that the ones that you physically make look like
3  the ones on here.
4     Q   So then why would that be invalid as functional
5  if they looked different?
6     A   I -- I don't know necessarily, but I know this
7  one, that's not the case.  I mean, they don't even look
8  alike.
9     Q   Right, so why -- this is the question for you,
10  sir:  Why would Exhibit 2, why are you claiming that to
11  be invalid as functional when you say it doesn't even
12  look like the part on the car?
13    A   I'm not sure.  I mean, I think with every
14  specific patent -- and I know there's quite a
15  few -- there's different issues.  But, I mean, with this
16  one specifically, I know that to be the case.  But
17  there's a lot of other ones where they may or may not
18  look alike.
19    Q   So no matter what the design looks like, if Ford
20  designers created it, it's your position that it's
21  invalid?
22    A   Well, I don't know about that.  Just because a
23  Ford designer makes something doesn't necessarily make
24  something valid or invalid.  I don't think that's a...
25    Q   Well, I asked you before if a Ford designer made



JOSEPH TSAI
January 3, 2017

## Page 41

1  a grille that never wound up on any car, could that
2  design patent be valid over your functionality challenge?
3      A   Yeah, and I told you that I don't -- I'm not an
4  attorney, but I don't know if there's been things that
5  have been made that look like that already.  Do you know
6  what I'm saying?  There's a lot of different
7  circumstances.
8      Q   I'm only -- I'm only asking with regards to your
9  functionality challenge.
10         If a Ford designer made a grille that never
11  wound up on a car, would it pass your functionality
12  challenge?
13         MR. OAKE:  Object to form; hypothetical.
14         THE WITNESS:  I don't know again.
15     Q  BY MR. LORELLI:  Why not?
16     A   Because I don't know what it looks like.  I
17  don't know what's available in the market.  I don't know
18  if somebody else made something that looks like it.
19     Q   So your functionality argument depends on other
20  designs in the market?
21     A   I mean, I'm not an attorney, but I think that
22  matters.  I mean, if somebody else came out with a design
23  and it's already available, I don't know if you can
24  patent a design that's already available.
25     Q   Okay.  I'm not asking about patent.  I'm just

## Page 42

1  asking about your functionality challenge, which is
2  you -- what you're supposed to be the corporate
3  representative for.
4      A   I understand that.
5      Q   Okay.  For your functionality challenge and your
6  functionality challenge only, if a Ford designer created
7  a grille design that never was placed on a vehicle, would
8  that grille design pass your functionality challenge?
9  Yes or no?
10     A   I don't know.
11         MR. OAKE:  Object to form; hypothetical.
12     Q   BY MR. LORELLI:  These parts that you talked
13  about -- the headlamp of an Explorer and grille of the
14  2004 F-150 -- where does New World get these parts?
15     A   We purchase them from Taiwan.
16     Q   And you have records of how many of each of
17  these particular parts you purchased; right?
18     A   Yes, I'd say, going back a couple years.
19     Q   When was the last time you purchased Ford
20  patented parts from Taiwan?
21     A   Will we agree that everything is alleged, right,
22  when you say that?
23     Q   Yes, sure.
24     A   Okay.  Great.
25     Q   When was the last time you -- when is the last

## Page 43

1  time you purchased aftermarket parts that correspond to a
2  Ford design patent from Taiwan?
3         MR. OAKE:  And -- and I'm going to object
4  to form.  Are you limiting it to the parts in this
5  lawsuit?
6         MR. LORELLI:  I -- not -- my -- my question
7  wasn't -- thank you for your objection.
8      Q   BY MR. LORELLI:  Can you answer the question,
9  please, sir?
10     A   Can you repeat the question?
11     Q   Yeah.
12         When was the last time you purchased Ford
13  parts that are allegedly covered by patents from Taiwan?
14     A   I -- I don't know.  I mean, I don't keep track
15  of it.
16     Q   Was it, you know, this -- within the last few
17  months?
18     A   It's possible.
19     Q   You don't know?
20     A   I don't know which specific patents you have and
21  which specific patents you're claiming.
22     Q   You've clearly purchased Ford parts from Taiwan
23  that are patent -- that are alleged covered by Ford's
24  design patents; right?
25     A   It's possible.

## Page 44

1      Q   Where did you get them from, if you didn't
2  purchase them from Taiwan?
3      A   Well, we purchase aftermarket auto body parts
4  from Taiwan.  I'm just not sure whether or not they're
5  under the scope of your patent.  I'm not sure which
6  patent you're referring to.
7      Q   Okay.  Who do you purchase parts from in Taiwan?
8      A   There's several different firms --
9      Q   Okay.
10     A   -- several different factories either there or
11  in China.
12     Q   Okay.  Who do you purchase them from?
13     A   Are you asking for the names?
14     Q   Yeah.
15     A   There's a company called Tong Yang Group.
16     Q   And they make plastic parts, bumpers, fascias?
17     A   And -- and sheet metal.
18     Q   They make sheet metal?
19     A   Yes, sir.
20     Q   Okay.
21     A   There's API.
22     Q   API?
23     A   Yes, sir.  And they also make both of those.
24     Q   Um-hum.
25     A   There's TYC, who makes lighting.



JOSEPH TSAI
January 3, 2017

---

Page 45

1    There's Depo who makes lighting as well.
2    There's YCC, Gordon.  Just -- I mean, those
3  are all the ones I can think of --
4    Q   Sure.
5    A   -- off the top that we buy aftermarket auto body
6  parts from.
7    Q   Okay.  From who have you boughten Ford
8  aftermarket body parts from?
9    A   I couldn't tell you.
10   Q   Do you have a record of that at your company?
11   A   Yes, sir.  But I was just prepared to talk about
12  the, I guess, 15 or so that related to this case.
13   Q   These particular parts?
14   A   Yes.
15   Q   Okay.
16   A   I don't know about the rest of the others.
17   Q   Okay.  So who did you buy these particular parts
18  from?
19   A   Recently?
20   Q   Sure.
21   A   I couldn't tell you definitively.
22   Q   Okay.  So you can't tell me where you purchased
23  the parts that are accused of infringement in this case?
24   A   Well, I'd have to go look at those specific
25  items.

---

Page 46

1    Q   And you didn't do that before this deposition?
2    A   Well, I mean, I had an idea.  But, I mean, that
3  stuff, I believe, has been produced.
4    Q   Well, then, you won't have any trouble telling
5  me who you purchased them from.
6    A   Well, if you give me the sheet, I don't mind
7  looking at it and telling you.
8        MR. LORELLI:  Let me hand you what we want
9  to mark as Exhibit 4.
10       (Tsai Exhibit 4 was marked.)
11   Q   BY MR. LORELLI:  This is one of the -- Exhibit 4
12  is one of the documents that we received in discovery in
13  this case, and it has the different part numbers that are
14  at issue -- not part numbers -- patent numbers at issue
15  in this case.
16       Are you familiar with this document?
17   A   I think so, but I think it might be missing some
18  data, too.
19       MR. LORELLI:  Okay.  Can we mark this as
20  Exhibit 5.
21       (Tsai Exhibit 5 was marked.)
22   Q   BY MR. LORELLI:  Mr. Tsai, we've marked as
23  Exhibit 5 a document that was produced to us in the ABPA
24  case, and it identifies some of these companies that you
25  had mentioned:  API, Gordon, and then it has some other

---

Page 47

1  companies that you did not mention.  And these were all
2  for the F-150 hood?
3    A   Well, you had originally asked me that sell --
4  that we purchased aftermarket auto body parts from.  I
5  didn't know that you were referencing the specific items
6  in this list.  But sure.
7    Q   Okay.
8    A   Just so you understand.
9    Q   This has got the F-150 hood and the F-150
10  headlight assembly on here.  Okay?
11   A   Okay.
12   Q   And this is from New World records?  This is the
13  type of information that you keep in your systems?
14   A   Yes, sir.
15   Q   And so you are able to tell me, down to the
16  parts and the quantities and the price, how many of these
17  particular parts you purchased from who and when;
18  correct?
19   A   Yes, sir.
20   Q   Okay.  We have not been provided with this type
21  of information for all of these parts that are covered by
22  the patents in Exhibit 4.
23   A   I -- okay.  Do you have a description --
24   Q   But are you able to do -- but you are able to do
25  that for us; right?

---

Page 48

1    A   If you could tie the patent to a specific OEM
2  number.
3    Q   Okay.  And why is knowing the OEM number
4  important?
5    A   At least if we know the OEM number, we have an
6  idea of what it's supposed to match to.  I'm -- I'm not a
7  patent attorney, so I don't --
8    Q   Well, these are your records.
9    A   I understand, but I don't know the patent
10  numbers and I don't --
11   Q   Okay.  Now, when you made these purchases from
12  these vendors in Taiwan, such as Gordon, did you have a
13  request from an owner of a vehicle that they needed such
14  a part?
15   A   No, sir.
16   Q   Okay.  Did New World --
17   A   Did we need to?
18   Q   New World purchases parts from Taiwan; right?
19   A   Okay.
20   Q   Right?
21   A   Yes, sir.
22   Q   And those parts are copies of the OEM parts;
23  right?
24   A   Yes.
25   Q   It imports them; right?

---



JOSEPH TSAI
January 3, 2017

Page 49

1    A   Yes.
2    Q   Puts them in their warehouse; right?
3    A   Yes.
4    Q   Offers them for sale; right?
5    A   What -- when you say "offer for sale," can you
6    define that?
7    Q   You put it up on your website or tell your
8    distributors you have them available; right?
9    A   Usually they call us in for it.
10   Q   Okay.
11   A   But they call us for all -- you know, not just
12   Ford.  There are calls for Nissan or BMW, Lexus.
13   Q   Have you ever -- are you aware, sir, that the
14   importation -- manufacture and importation and offer for
15   sale of a patented design is an infringement?  Are you
16   aware of that?
17   A   I -- I think so.
18   Q   Okay.
19   A   But I feel like you're getting legal on me, and
20   I'm not an attorney.
21   Q   No, I'm not.  What I'm trying to understand is
22   your patent exhaustion defense.
23   A   Okay.
24   Q   Okay.  You say you're authorized to sell these
25   parts because a Ford owner wants them; right?

Page 50

1    A   Yes.
2    Q   Okay.  What Ford owner wanted you to make this
3    purchase of 15 units of the 2004 hood from Gordon Auto
4    Body Parts in 2008?
5    A   I -- I don't know who wanted to, but I'm not
6    sure where you're coming at with that.
7    Q   New World had no authority from any Ford truck
8    owner to purchase parts from Taiwan; isn't that correct,
9    sir?
10       MR. OAKE:  Object to form.
11       THE WITNESS:  When -- when you say
12   "authority," I'm not sure how you mean by that.  But, I
13   mean, these customers are calling us asking for these
14   parts, and they want to repair their vehicle.
15   Q   BY MR. LORELLI:  Okay.  I'm talking about your
16   order from Taiwan.
17   A   Okay.
18   Q   There was no customer that authorized your order
19   to Taiwan; right?  There's no --
20   A   Do they need to?
21   Q   Can you just factually answer my question, sir?
22   A   Okay.
23   Q   Was there any customer that authorized your
24   order of infringing parts from Taiwan?
25   A   No, but I don't think they need to.

Page 51

1    Q   Is there any Ford vehicle owner that authorized
2    your importation of infringing parts from Taiwan?
3    A   No.
4    Q   Is there any Ford vehicle owner that authorized
5    your placing Ford patented parts for sale on your
6    websites?
7    A   No, but I believe, through implied license, that
8    we're permitted to purchase those parts for the customer
9    who then purchases them from us.
10   Q   Okay.  What -- what license is implied, sir?
11   A   Well, I guess the patent exhaustion defense --
12   or our position is that whenever someone buys a Ford
13   F-150, that they have the ability to repair their vehicle
14   after that without having to, I guess, pay for the
15   additional, if you want to call it, alleged patent fee.
16       And so because of that, they have the right
17   to buy something from us, and when we have, I guess, an
18   implied license, so to speak, that we can buy them and
19   sell them to them.
20   Q   So you have permission to import these parts
21   into the United States?
22   A   Well, I think when they call us to request it.
23   I don't know about that other stuff, but, I mean, when
24   they call us to request the part.  I mean, I think they
25   have the right to be able to fix their vehicle.

Page 52

1    Q   Okay.  Are you -- when you sell a part, do you
2    know whether it ends up on a vehicle or not?
3    A   No.
4    Q   When you sell a part --
5    A   But I -- wait.  I have a question.  Where --
6    where else would it end up?
7    Q   If there is a -- well, let me ask -- well, let
8    me ask you this:  We've talked about aftermarket parts;
9    right?
10   A   (No response.)
11   Q   We've talked about aftermarket parts; right?
12   A   Yes.
13   Q   We've talked about OEM parts; right?
14   A   Yes.
15   Q   Are there any other types of parts that are used
16   in automotive repair?
17   A   Yes.
18   Q   What other types of parts are those?
19   A   Salvage.
20   Q   Any other types?
21   A   Recycled or reconditioned.
22   Q   Are you in the salvage business?
23   A   No, sir.
24   Q   Are you in the recycled or reconditioned
25   business?



JOSEPH TSAI
January 3, 2017

---

Page 53

1    A   No, sir.
2    Q   Why not?
3    A   I don't know.  We just never looked into it.  I
4    couldn't tell you.  Just never got discussed.  But our
5    business is distributing aftermarket parts.  That's where
6    our competitive advantage is.  It's what we know.
7    Q   You -- you'll make better money doing that than
8    selling salvage parts; right?
9    A   I don't know.  But, I mean, I know we make
10   decent money distributing the aftermarket parts.
11   Q   If a -- where does a salvage part come from?
12   A   Whenever a vehicle is totaled and the insurance
13   company decides that it's more expensive to repair the
14   vehicle than to just total it, then the vehicle ends up
15   in an auction, and then someone will typically buy that
16   vehicle and sometimes it will get repaired, if the labor
17   is cheap enough, or they will remove the components and
18   sell them.
19   Q   Okay.  Where do recycled and reconditioned parts
20   come from?
21   A   Recycled -- well, reconditioned -- reconditioned
22   and recycled is where the vehicle -- well, and I think
23   that could be only with some items.
24       But let's say a bumper cover, for example.
25   If you're able to put some Bondo on it, you could return

---

Page 54

1    that bumper.  I mean, I'm not a bumper technician, but
2    that's my understanding; that they're able to fix the
3    bumper.
4    Q   So if I was a person who drove a car and the
5    bumper was damaged but it wasn't very bad, it could be
6    taken off the car and reconditioned, that bumper?
7    A   That specific one that's on the vehicle?
8    Q   Yeah.
9    A   I don't think that would work.
10   Q   Typically it's taken off the vehicle, an
11   aftermarket part is put on, and then the reconditioning
12   process starts?
13   A   What?  I don't --
14   Q   Tell me how a reconditioned part would find its
15   way back on a vehicle.
16   A   I mean, a reconditioned part, if it gets in an
17   accident, then they take it off and then a recycle yaw
18   will come rebuild it or return it to its original shape.
19   Q   Okay.  It doesn't go back on the original car,
20   though, does it?
21   A   I don't know, but I don't think that particular
22   one generally does.
23   Q   I'm sorry?
24   A   I don't know, but I don't think that particular
25   one does.

---

Page 55

1    Q   Right.  Instead, an aftermarket part or an OEM
2    part will be put on that car?
3    A   Could be.
4    Q   Okay.  And then that recycled part is sold to
5    somebody else down the road?
6    A   Sure.  Either that or it gets thrown away.
7    Q   Well, why would they go through the trouble of
8    recycling it if they're just going to throw it away?
9    A   You just don't know how much work is involved.
10   Q   Sometimes it gets thrown away?
11   A   Yes.
12   Q   Most of the time, though, if they're -- if they
13   think they can recycle it, they recycle it and it gets
14   put back in the stream of commerce?
15   A   As far as I know.
16   Q   And it competes against parts like you sell,
17   right, aftermarket parts?
18   A   To -- to some extent.
19   Q   And it competes against OEM parts to a certain
20   extent; right?
21   A   To some extent.
22   Q   And you're aware that Ford has never asserted
23   infringement against recycled or reconditioned parts;
24   right?
25   A   If that's what you're representing.  But I don't

---

1    know.
2    Q   Are you aware of Ford ever asserting
3    infringement against recycled or reconditioned parts?
4    A   No, I'm not aware.
5    Q   Are you aware of Ford ever asserting
6    infringement against salvaged parts?
7    A   No, I'm not aware.
8    Q   So if a consumer out there is in need of parts,
9    they could purchase an OEM part; right?  They could
10   purchase a salvaged part, they could purchase a recycled
11   or reconditioned part; right?
12   A   Yes.
13   Q   They could also purchase an aftermarket part
14   from LKQ; right?
15   A   Sure.
16   Q   So the customer has a lot of choices; right?
17   A   I don't know if I agree with that.  I mean --
18   Q   Well, the customer at least has four choices --
19   or there's four options; right?
20   A   I mean, I think the price point's key here.
21   Q   Okay.  Are your parts more expensive than
22   salvaged parts?
23   A   Depending on particular items; but generally,
24   no.
25   Q   Are your parts more expensive than recycled or

---



JOSEPH TSAI
January 3, 2017

Page 65

1  just certification bodies.
2      Q   So the answer would be there is no government
3  agency that ensures that the parts that you sell are
4  safe; is that correct?
5      A   Well, I mean, there's the SAE and DOT that has
6  to approve certain parts.
7      Q   The SAE and the DOT?
8      A   Yes, sir.
9      Q   And do you submit your parts to the Department
10  of Transportation for approval?
11      A   We don't, but I believe that our manufacturers
12  do, because they say that their products are SAE and DOT
13  approved.
14      Q   The ones in Taiwan?  The manufacturers in
15  Taiwan?
16      A   Yes.
17          MR. LORELLI:  We can take your break.
18          THE VIDEOGRAPHER:  We're off the record at
19  2:39 p.m.  This marks the end of Disc Number 1.
20          (Recess from 2:39 p.m. to 2:47 p.m.)
21          THE VIDEOGRAPHER:  We're back on the record
22  at 2:47 p.m.  This marks the beginning of Disc Number 2.
23  Please continue.
24          (Tsai Exhibit 6 was marked.)
25      Q   BY MR. LORELLI:  Mr. Tsai, we've marked as

Page 66

1  Exhibit Number 6 defendant's objections and responses to
2  our first set of admissions regarding these two defenses
3  that we're here talking about today.
4      A   Okay.
5      Q   Are you familiar with this document?
6      A   Yes, sir.
7      Q   In fact, you probably reviewed it before it went
8  out the door; right?
9      A   Yes, sir.
10      Q   I don't know -- did you sign a verification for
11  it?
12          MR. OAKE:  I'm sorry.  What was that?  I --
13  I didn't get that.  You probably reviewed it what?
14          MR. LORELLI:  "You probably reviewed it
15  before it went out the door."
16          MR. OAKE:  "Before it went out the door."
17  Okay.  Thank you.
18      Q   BY MR. LORELLI:  Did you ever sign a
19  verification for these?
20      A   I believe so.
21      Q   Okay.  So these are verified responses of New
22  World, Auto Lighthouse, and UCC?
23      A   Yes.
24      Q   Okay.  Let me direct your attention to a couple
25  that I'd like to probe with you a little bit.  Number 21

Page 67

1  let's start with.
2          It says:  "Ford employed designers trained
3  in the fine arts to create the exterior appearance of the
4  2004 F-150 hood.  Response:  Admit."
5          Do you see that?
6      A   Yes, sir.
7      Q   Is the same true for all of the other parts at
8  issue in this case?
9      A   I think that's fair to say.
10      Q   If we can go to Number 20, right above it.
11      A   Okay.
12      Q   It says:  "The design of an automotive hood is
13  dictated sole" -- I'm sorry.  Strike that.
14          Number 20 says, quote:  "The design of an
15  automotive hood is not dictated solely by function,"
16  close quote.
17          Do you see that?
18      A   Yes, sir.
19      Q   And there's objections made to this, and it says
20  that, quote:  "This request does not define the term
21  'function' and whether the term includes aesthetic
22  functionality."
23          Do you see that?
24      A   Yes, sir.
25      Q   Would this request be admitted if it does not

Page 68

1  include aesthetic functionality?
2      A   Sorry.  That's kind of confusing.
3      Q   Yeah.  There's a lot of "nots" in there, huh?
4  Or negatives.
5          Well -- okay.  Will you agree -- let's back
6  up and get away from this for a second.
7          Do you agree that the design of an
8  automotive hood is not dictated by things other than
9  utilities or operation?
10          That's not a good question, is it, because I
11  see the look on your face?  So let me ask it again.
12          Do you agree that the design of an
13  automotive hood is not dictated solely by its function as
14  a hood?
15      A   Geez.  Do I agree -- I'm sorry.
16      Q   Sure.
17      A   I need to think about this.  Can you say that
18  one more time?  This is actually kind of confusing.
19      Q   Do you agree that the design of an automotive
20  hood is not dictated solely by its function as a hood?
21  So it's basically Number 20 there --
22      A   I don't know what its function is.
23      Q   You have defined function as aesthetic
24  functionality, or that the hood needs to look like the
25  hood that's coming off of the vehicle; right?

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOSEPH TSAI
January 3, 2017

---

Page 69

1    A   Yes.
2    Q   And I'm defining function as not function as it
3    needs to look like the hood coming off the vehicle, but
4    just needs to function as a hood, meaning --
5    A   What other function are you referring to?
6    Q   That it covers the front of the car.
7    A   Okay.
8    Q   Or any other function that you can think of
9    other than the aesthetic functionality that you've
10   defined earlier; right?
11   A   Okay.
12   Q   So is the design of an automotive hood not
13   dictated solely by its function as a hood?
14   A   I don't know. I mean, if you're saying that the
15   hood has -- are you saying that the function of the hood
16   is also to cover the engine? Is that what you're trying
17   to say?
18   Q   What I'm -- what I'm trying to figure out is
19   whether you can admit this one but for the aesthetic
20   functionality.
21   A   I mean, I'm not 100 percent sure on that.
22   Q   Let me maybe come back and ask you this: If we
23   go out into the parking lot, you'll see a bunch of
24   different hoods; right?
25   A   Yes, sir.

---

Page 70

1    Q   And a lot of them have different breaks and
2    different scoops or curvature; right?
3    A   Yes.
4    Q   And those breaks or scoops or curvature were
5    created by a designer that wanted it to look that way;
6    right?
7    A   Sure.
8    Q   All of those hoods still function as a hood out
9    there in the parking lot; right?
10   A   Well, but when you say "function as a hood," I
11   don't know -- I mean, I think that the function of that
12   hood is dictated by its design. And it has to -- it has
13   to mate and match with the surrounding parts of the
14   vehicle, right, for it to work on that specific make or
15   model or year.
16   Q   If you want it to look like the one that came
17   off of it; right?
18   A   Yes.
19   Q   I guess other than -- other than looking like
20   the one that came off the vehicle, is there any other
21   function that would dictate the design of the 2004 F-150
22   hood, in your position?
23   A   I don't think so.
24   Q   Other than having to look like the headlamp of
25   the 2004 vehicle --

---

Page 71

1    A   Can I scratch that -- that last part? I'm not
2    100 percent sure.
3    Q   Is that because you're looking at your counsel
4    who's got his hands in his face?
5    A   Well, it's not necessarily that. I'm just not
6    100 percent sure. But I'm kind of confused by the
7    question in general.
8    Q   Can you identify for me, as you sit here today,
9    a function other than aesthetic functionality that would
10   dictate the shape or the curvature or the aesthetic
11   appearance of a hood?
12   A   I think that the design is -- the function of
13   that hood is its design.
14   Q   Okay.
15   A   That's as far as I'm willing to --
16       MR. OAKE: And I'm going to say for the
17   record, I've had my hands in my face for four, five, or
18   more questions before that, and the witness did not, you
19   know, modify his answer, and I resent the implication
20   that the witness is answering according to my body
21   language. That is absolutely false.
22       MR. LORELLI: I think the video will show
23   the witness looking over at you several times when you
24   made that body language but --
25       MR. OAKE: Well --

---

Page 72

1        MR. LORELLI: -- we'll move on.
2        MR. OAKE: -- okay.
3        MR. LORELLI: There's no other place --
4        MR. OAKE: It will show what it will show.
5    But I'm just saying I've had my hands in my head for
6    several questions, and it was completely unrelated to his
7    answers.
8    Q   BY MR. LORELLI: We had talked about performance
9    parts.
10   A   Yes, sir.
11   Q   Can you -- and you're aware that performance
12   parts for the -- well, let's -- let's take the 2004 F-150
13   headlamp as an example. Okay?
14   A   Okay.
15   Q   The -- can you identify a function that the
16   performance part does not perform, but the OEM part does?
17   A   The look, the design.
18   Q   Anything else?
19   A   I don't know.
20   Q   Are you aware of anything else? Yes or no?
21   A   Not that I can think of.
22   Q   That was maybe the easier way of asking that --
23   that question.
24   A   Yeah.
25   Q   And would the same be true for all the other

---



JOSEPH TSAI
January 3, 2017

## Page 73

1 parts?  Other than looking like the OEM part, a
2 performance part serves every other function?
3    **A   I don't know.  When you say "every other**
4 **function," I think that's -- you're trying to find some**
5 **other function.  But I'm not necessarily trying to define**
6 **what the functions are.  I'm just trying to say that the**
7 **design -- the -- its function is its design.**
8    Q   Right.  No, no, my --
9    **A   Does that --**
10    Q   I -- I'm just trying to make sure that I'm not
11 missing anything, and there's not some other function
12 that you're going to identify later.
13      You've identified the function as looking
14 like the OEM part, and these -- the performance parts
15 that we've talked about don't perform that function,
16 right, that you've defined?
17    **A   Yes.**
18      MR. OAKE:  Object to form.
19    Q   BY MR. LORELLI:  And the performance parts,
20 though, do everything else the original part does except
21 for that aesthetic function; right?
22    **A   You'd have to tell me which part specifically**
23 **you're referring to.**
24    Q   Well, headlamps.
25    **A   Could I see a picture?**

## Page 74

1    Q   Why do you need to see a picture?
2    **A   Well, I don't know in what way something could**
3 **be different.  I'd rather look at the picture than**
4 **speculate.**
5    Q   How about the hood?
6    **A   What about the hood?**
7    Q   Is there any function -- strike that.
8      When a -- let's go -- can we go to
9 Number 22?
10    **A   Yes, sir.**
11    Q   It says:  "The function of an automotive
12 headlamp can be performed with differently shaped
13 headlamps."
14      Okay?  And that is not admitted.  Can you
15 explain to me why that was not admitted?
16    **A   I mean, I can testify to facts, and I feel like**
17 **with something like this, it's starting to get into**
18 **legal --**
19    Q   Well, you --
20    **A   -- theories which I'm a little bit uncomfortable**
21 **with.**
22    Q   That's fine.
23      You verified these responses; right?
24    **A   Yes, sir.**
25    Q   This response does not admit this request:

## Page 75

1 right?
2    **A   Yes, sir.**
3    Q   This response identifies aesthetic
4 functionality, which you've said means it has to look
5 like the OEM part: right?
6    **A   Yes.**
7    Q   But for that, could that -- but for aesthetic
8 functionality, could Request Number 22 be admitted?
9    **A   When you say "but for," what does that mean?**
10    Q   Is aesthetic functionality the only reason why
11 you didn't admit Number 22, or is there another reason?
12    **A   I don't know if I can answer that comfortably.**
13    Q   You don't know?
14    **A   I mean, I'm not an attorney.**
15    Q   I'm trying to understand these responses that
16 you verified.  These responses says:  "This request does
17 not define the term 'function' and whether that term
18 includes aesthetic functionality."
19      So if the term "function" does not include
20 the term "aesthetic functionality," would you be able to
21 admit Request Number 22?
22    **A   Again, I don't know.  I mean, I'm not an**
23 **attorney.**
24    Q   Now, the headlamp that you sell for the
25 2004 F-150 is an --

## Page 76

1    **A   Are you looking at a different one or the same**
2 **one?**
3    Q   I'm not -- different.  Different one, not -- not
4 related to the earlier question.
5    **A   Okay.**
6    Q   But the headlamps that you sell, the aftermarket
7 headlamps for the 2004 F-150, those headlamps are
8 intended to be put in the place of the headlamp that was
9 there originally; right?
10    **A   Yes.**
11    Q   And not a single piece of that original headlamp
12 is used in your headlamp: right?
13    **A   For that Ford one?**
14    Q   Yeah.
15    **A   The Ford F-150?**
16    Q   Right.
17    **A   Not to my knowledge, but -- I mean, I'm not a**
18 **repair technician, but...**
19    Q   Can we go to Number 34?
20    **A   Yes, sir.**
21    Q   "The consumer may choose to repair a vehicle
22 with a damaged grille with a grille having a different
23 appearance than the damaged grille."
24      Do you see that in the admission?
25    **A   Yes.**



JOSEPH TSAI
January 3, 2017

## Page 77

1    Q    Could that be what's called a "performance
2    grille"?
3    A    Yes, they could use a performance grille.
4    Q    Does that performance grille still perform the
5    function of a grille?
6    A    I don't know what the "function of a grille" is.
7    Q    You've been in the automotive business for
8    11 years?
9    A    Yes.
10   Q    You don't know what a grille does?
11   A    Well, I don't know what you're legally defining
12   the function as.  Let's put it that way.
13   Q    Well, when a consumer chooses to replace a
14   damaged grille with a differently look -- looking
15   grille --
16   A    Um-hum.
17   Q    -- a grille with a different appearance --
18   A    I'm sorry.  Yes, sir.
19   Q    -- does the car still work?
20   A    The car still works.  When you mean -- by
21   "work," driving it?
22   Q    Yeah.
23   A    Yes, you could still drive the vehicle.  But
24   that wouldn't -- the performance grille would not return
25   the vehicle to its original condition --

## Page 78

1    Q    It would still --
2    A    -- which is what an insurance company would
3    prescribe.
4    Q    It would still allow the car to function as a
5    car?
6    A    To drive.
7    Q    Correct?
8    A    It would allow the car to drive as long as the
9    accident wasn't too bad.
10   Q    Assuming there was no other problems, other than
11   the grille?
12   A    Yes, the car could drive.
13   Q    And the same would be true for all the other
14   parts that we have in this case, whether they be hoods,
15   headlamps, bumpers; right?  The car could still drive, it
16   just wouldn't look the same?
17   A    For most of those parts, I think so.
18   Q    Well, why not all?
19   A    Actually, let's just say yes.
20   Q    Okay.  Are there performance parts that are less
21   expensive than aftermarket parts?
22   A    I don't know.
23   Q    Do you sell your performance parts, the ones
24   that you have currently have had your shelves for a
25   number of years, for less than your aftermarket parts?

## Page 79

1    A    I don't know.
2    Q    In your declaration that you signed for these
3    motions, you say that:  "New World has sold the accused
4    products in the past."
5         You say in your declaration "in the past."
6    A    Can I see the declaration?
7    Q    You know, I've just got my copy that's got a
8    marking on it.  I can show it to you, but I'm going to
9    ask for it back.
10   A    Okay.
11   Q    And I'm just --
12   A    Are we -- are we moving past this one?
13   Q    Yeah, yup.  And I'm just asking you about
14   Paragraph 4.
15   A    Okay.
16   Q    And it's really just "in the past" that I want
17   to ask you about, but take your time and look at that if
18   you'd like.
19   A    This is the most recent declaration; correct?
20   Q    Yes.
21       MS. METTES:  Actually, he had one after.
22       MR. LORELLI:  Oh, really?
23       MS. METTES:  For the motion to dismiss,
24   yes.
25       MR. LORELLI:  I'm sorry.

## Page 80

1        MS. METTES:  The second-to-last.
2    Q    BY MR. LORELLI:  I there was -- this is the one
3    from the functionality and patent exhaustion.
4    A    Okay.
5         (Witness reviews document.)
6         THE WITNESS:  Okay.  So what's your
7    question?
8    Q    BY MR. LORELLI:  My question is:  Is do you
9    still offer those parts for sale?
10   A    I'm not 100 percent sure.
11   Q    Why?
12   A    Well, I'd have to -- can I see that again?
13   Q    Yeah.
14   A    I just couldn't tell you definitively.  I'd have
15   to go look at it.
16   Q    Okay.  That's fine.  But why did you use the
17   words "in the past" in your declaration?
18   A    I don't know.  It was probably just -- it was
19   just a statement.
20   Q    Now, you -- actually, it was about a year ago we
21   were in this same room and I asked you whether you were
22   still selling the parts, and you told me you were not.
23       Do you recall that testimony?
24   A    If it's written on there, yes.  But I don't
25   recall it.



JOSEPH TSAI
January 3, 2017

---

Page 81

1    Q   But you are selling them today; right?
2    A   It's possible.
3    Q   Okay.  Let's go through some...
4        (Tsai Exhibit 7 was marked.)
5    Q   BY MR. LORELLI:  This is Exhibit Number 7.  This
6    is Auto Lighthouse selling the 2004 F-150 headlamp;
7    correct?
8    A   Yes, sir.
9    Q   And when -- what's the date on this?
10   A   The 21st.
11   Q   Of?
12   A   Of December, 2016.
13       MR. LORELLI:  Okay.  I'll mark this as
14   Exhibit 8.
15       (Tsai Exhibit 8 was marked.)
16   Q   BY MR. LORELLI:  And, Mr. Tsai, we've marked as
17   Exhibit 8 Auto Lighthouse offering for sale the F-150
18   hood; is that right?
19   A   Yes, sir.
20   Q   And that's also from December of 2016, just a
21   few days ago?
22   A   Yes, sir.
23   Q   And this price is being offered at $509.  Is
24   this a steel or aluminum one?
25   A   I couldn't tell you.  I'd have to look at it to

---

Page 82

1    tell.
2    Q   But Auto Lighthouse is still selling that part?
3    A   Yes, sir.
4        MR. LORELLI:  Let's mark this as Exhibit 9.
5        (Tsai Exhibit 9 was marked.)
6    Q   BY MR. LORELLI:  We've marked as Exhibit 9 Auto
7    Lighthouse's offer for sale of a Ford Mustang front
8    bumper cover for the GT model; right?
9    A   Yes, sir.
10   Q   Auto Lighthouse is selling, at least as of a few
11   days ago, selling the front bumper cover for the Ford
12   Mustang GT 2005 to 2009 models; right?
13   A   Yes.
14   Q   Where did Auto Lighthouse get this part from?
15   A   I don't know.  I'd have to go look.
16   Q   Okay.  Can we go -- and this is -- it's on the
17   second page of the exhibit, but it's kind of the --
18   A   Exhibit 9?
19   Q   It's Exhibit 9.  But if you go to the next page,
20   it has -- what is being shown there at the top of the
21   next page?  So it's on the back side of the first page.
22   A   Other Ford Mustang related items.
23   Q   Are those also front bumper covers?
24   A   Yes.
25   Q   Are they also for the 2005 to 2009 Ford Mustang?

---

Page 83

1    A   I think so.  I'm not sure.
2    Q   Well, doesn't the first one say "Ford Mustang
3    2005 to 2009 Duraflex GC concept front"?
4    A   The first, second, fourth, and fifth do.
5    Q   Okay.
6    A   But I don't know about the third and the sixth.
7    Q   Okay.  So the -- I'm sorry.
8        You said the first, second, fourth and fifth
9    do?
10   A   Yes.
11   Q   Okay.
12   A   From left to right.  They -- they say that, so I
13   think that's what they're representing.
14   Q   Those would be performance parts?
15   A   I can't tell you.  I don't know.
16   Q   Well, let's look at the first one.  Ford Mustang
17   '05 to '09 Duraflex GT concept front, $215.
18       Do you see that?
19   A   Yes, sir.
20   Q   That performance part -- well, I'm sorry.
21       That part looks different than the part
22   you're selling; right?
23   A   I'm not 100 percent sure.  But if it's on that
24   vehicle, then yes.
25   Q   Okay.  And it's being offered at $215; right?

---

Page 84

1    A   Plus the shipping.
2    Q   Okay.  And you -- what's your price?
3    A   $244.15.
4    Q   So it's less expensive when you don't include
5    the shipping cost, but it's less expensive for the part;
6    right?
7    A   It's more expensive than the part.  If you
8    include the shipping costs, then that one's --
9    Q   Without considering shipping, which part is
10   cheaper?
11   A   The Duraflex.
12   Q   And -- okay.  Let's go to the next one.
13       (Tsai Exhibit 10 was marked.)
14   Q   BY MR. LORELLI:  I'll mark as Exhibit 10 --
15   A   I will say, though, on Exhibit 9, that -- the
16   bumper cover that we're selling doesn't look like the one
17   on your design.
18   Q   I'm sorry.  Say that one more time?
19   A   The bumper cover that's in this picture --
20   Q   Um-hum.
21   A   -- does not look like the one on your design.
22   Q   The patented design or the -- our OEM part?
23   A   The design patent booklet, or whatever you want
24   to call it.
25   Q   Okay.  So then you wouldn't need to take our



JOSEPH TSAI
January 3, 2017

Page 85

1  design to sell aftermarket parts then; right?
2      A  Maybe or maybe not.  I don't know.
3      Q  Can we go on to what I've marked as Exhibit 10?
4      A  Okay.
5      Q  And this is -- Autobody Parts, that's a company
6  related to yours; right?
7      A  Yes.
8      Q  And they're selling the Ford Mustang 2005 front
9  bumper cover base model; right?
10     A  Yes, sir.
11     Q  And that's from December of 2016?
12     A  Yes, sir.
13         (Tsai Exhibit 11 was marked.)
14     Q  BY MR. LORELLI:  We've marked as Exhibit 11
15  another eBay listing of a Ford Mustang 2005 to 2009
16  left -- LH, left-hand headlamp -- headlight/headlamp lens
17  and housing?
18     A  Marc?
19     Q  Yeah?
20     A  Just so you know, Exhibit 10 with that specific
21  bumper cover, I think it's the same way.  When you
22  compare what's in the picture against design, I don't
23  think they're consistent.
24     Q  So it doesn't matter what design we have in our
25  design patents?  Whether they cover the OEM part or not,

Page 86

1  they're still invalid as functional, though?
2      A  I'm not here to argue that.
3      Q  Well, I would like to know your position.
4      A  I understand, but I'm not here to argue that
5  point with you.
6      Q  Do you know or not know?
7      A  I don't want to conjecture.
8      Q  Okay.  Can we go to Exhibit 11?  This is an Auto
9  Body Parts Express.  That's another company of yours;
10  right?
11     A  Yes.  This one?
12     Q  Yes.  And they're selling the Mustang headlight,
13  a 2005 model year; right?
14     A  Yes, sir.
15     Q  So you're selling it for $65; right?  $65.98?
16     A  Yes, sir.
17     Q  Depo, is that one of your suppliers?
18     A  Where is that written?
19     Q  Kind of like two-thirds of the way down on the
20  bottom right.
21     A  Yes, I think so.
22     Q  They're one of your suppliers?
23     A  I don't know about that particular item, but
24  Depo is one of our suppliers.
25     Q  At least somebody who's -- somebody else is

Page 87

1  selling that same part for $47; right?
2      A  I don't know if that's the same part.
3         (Tsai Exhibit 12 was marked.)
4      Q  BY MR. LORELLI:  Okay.  Mr. Tsai, we've marked
5  as Exhibit 12 another offer for sale on eBay from Auto
6  Lighthouse.  That's also one of the parts at issue in
7  this case; correct?
8      A  Yes.
9         When I say "in the case," we're talking
10  about all of them; right?
11     Q  Yes.
12     A  Just so --
13     Q  Yes.
14         (Tsai Exhibit 13 was marked.)
15     Q  BY MR. LORELLI:  Mr. Tsai, Exhibit 13 is Auto
16  Lighthouse, again, selling one of the rear bumper covers
17  at issue in this case; correct?
18     A  Yes.
19     Q  And that's from just a few months ago?
20     A  Yes.
21     Q  So in the declaration when you said "in the
22  past," you really meant in the past and currently; fair?
23     A  Fair.
24     Q  Your Lexus GX 350 --
25     A  GS 350.

Page 88

1      Q  GS 350.
2         Do you own that car or is that a leased car?
3      A  I own it.
4      Q  Have you ever leased a vehicle?
5      A  No, sir.
6      Q  Do you know who owns a vehicle when it's leased?
7      A  Probably the motor company or the dealership,
8  I'd assume.
9      Q  When a car is leased, do they -- can they -- do
10  they still get repaired?
11     A  Yes, sir.
12     Q  Who authorizes you to sell your aftermarket
13  parts in that instance?
14     A  I -- I don't know.
15     Q  Nobody; right?  Because you --
16     A  I don't know in that -- in that set of
17  circumstances what the --
18     Q  Well, you told me before it was the owner of the
19  car that authorized you, or impliedly authorized you;
20  right?
21     A  Yes.
22     Q  In the case of a leased car, who authorizes you
23  or impliedly authorizes you?
24     A  I don't know.  I guess it would be the owner of
25  the vehicle.



JOSEPH TSAI
January 3, 2017

---

Page 89

1    Q    So a Ford dealership who makes money selling
2    Ford OEM parts authorizes you to sell aftermarket parts?
3    A    I'm not sure how -- I'm not sure how a lease
4    contract works.
5    Q    Okay.  So your patent exhaustion defense doesn't
6    apply to leased vehicles?
7    A    I don't know.
8    Q    Can we go back to Exhibit 3, please?
9         (Discussion off the record.)
10   Q    BY MR. LORELLI:  5.  I'm sorry.  Exhibit 5.
11   It's this one, Mr. Tsai.  Do you have that in there?
12   A    Oh.
13   Q    So this represents your purchases from Taiwan of
14   various parts; right?
15   A    Yes, sir.
16   Q    Okay.  And it has the quantity and the price?
17   A    Yes, sir.
18   Q    And if we go to Exhibit 4, which is the other
19   one that you have in front of you, who created that
20   document?
21   A    Exhibit 4?
22   Q    Yeah.
23   A    I'm not positive.
24   Q    Okay.  Were you involved in its creation?
25   A    Yes.

---

Page 90

1    Q    Who else was involved in its creation?
2    A    I believe James was -- James had to have been
3    involved in this.
4    Q    Is that James Ma?
5    A    Yes, sir.
6    Q    Okay.
7    A    And I'm not sure about the patent numbers, but I
8    believe -- well, I'm not sure, but maybe Mark Shin as
9    well with telemark and/or Robert Oake.
10   Q    Why would telemark be involved?
11   A    Well --
12   Q    Let me back up.
13        Does New World employ Mark Shin?
14   A    No, sir.
15   Q    Okay.  So how -- why would he be involved?
16   A    Well, we were asked to try to match up some of
17   the patent numbers.  But when you look at the patent
18   numbers against the Partslink numbers against the design
19   in the actual patent, I guess, book, if you want to call
20   it that, we just weren't sure whether or not they were
21   consistent --
22   Q    Okay.
23   A    -- which is why we asked Mark.
24   Q    Sure.
25        Let's look at one of the headlamp ones.

---

Page 91

1    Okay.  I'll represent to you, sir, that the first line
2    item on this is the F-150 headlamp.
3    A    Okay.
4    Q    And it has:  "Sale price, 91; cost, 61."
5         Do you see that?
6    A    Yes, sir.
7    Q    So your cost, meaning New World's cost, is $61
8    for that part, to get it from Taiwan; is that right?
9    A    Yes, sir.
10   Q    And you'd sell it for $91?
11   A    Yes, I think so.
12   Q    A $30 markup?
13   A    Yes.
14   Q    Okay.  If you go to Exhibit 5, if you look at
15   the second entry, that's a headlamp assembly for the
16   F-150; right?
17   A    Yes, sir.
18   Q    It says your price was $30; right?
19   A    Yes, sir.
20   Q    For that particular purchase?
21   A    Yes, sir.
22   Q    But yet when you first purchased it in 2005, it
23   was $60; right?
24   A    That's a sale date.
25   Q    I'm sorry?

---

Page 92

1    A    That's a sale date on Exhibit 4 that first line.
2    Q    That's the first day you sold it?
3    A    I don't know if it's the first day we sold it,
4    but that was the sale date for this specific invoice
5    number, but not a purchase date.
6    Q    Okay.  So why does -- what I'm trying to
7    understand is, on Exhibit Number 4, your cost show almost
8    a number twice as high as the amount that it cost you to
9    get it from Eagle Eyes in Taiwan?
10   A    Okay.
11   Q    Why is that?
12   A    I'm not sure.  It's probably market forces.
13   Q    Well, who put this cost number together?
14   A    James.  But he didn't put it together.  That's
15   just what the market was sold for.
16   Q    Well, the sale price is $81 -- or, I'm sorry,
17   $91; right?
18   A    Yes.
19   Q    Why -- why -- I guess why don't these numbers
20   match up?  Do you have any idea?
21   A    I couldn't tell you, but I'm sure there's
22   material costs, labor costs, that all go into it.  I
23   mean, freight costs.  I couldn't tell you definitively
24   why, but, I mean, the parts aren't the same price every
25   time.

---



JOSEPH TSAI
January 3, 2017

## Page 97

1     So --
2   A  Marc, are you representing that this company is
3 the same as the one that we purchased from?
4   Q  Yeah.  Isn't it?
5   A  I don't know.
6   Q  You told us before you purchased from Autolights
7 in Michigan, and this is from their website?
8   A  Okay.  If that's what you're representing.
9   Q  I'm just use -- I'm just using it as an image.
10     But to get you to -- is this consistent with
11 your understanding of the industry, that automotive
12 manufacturers would change headlights from a 2014-year to
13 a 2015-year?
14   A  It's possible.
15   Q  And why would they do that?
16   A  I don't know.
17   Q  Do you have any understanding?
18   A  To sell more vehicles.
19   Q  To look more attractive?
20   A  Sure.  That's a fair point.
21     Marc, I'm just not sure if this is the same
22 company, for what it's worth.
23   Q  Okay.  Well, we'll look into that.  I mean, I'm
24 really raising it with you with regards to the
25 photographs and the comments about them --

## Page 98

1   A  Okay.
2   Q  -- to see if that's consistent with your
3 recollection that -- you know, well, let me -- let me
4 just back up and ask you more generally.
5     I mean, automotive design is -- is quite the
6 industry; right?  I mean, people have been designing cars
7 and car parts for a hundred years; right?
8   A  If you say so.
9   Q  You don't think so?
10   A  I'm sure some people are designing them.
11   Q  Okay.  And those people that design them, they
12 make decisions based on what will look good; right?
13   A  If you say so.  I'm --
14   Q  You don't know that?
15   A  I'm not an automotive designer.
16   Q  Okay.  So you have no understanding of -- of
17 automotive design at all, do you?
18   A  No, sir.
19   Q  You just want to be able to copy those
20 automotive designs that were created and be able to sell
21 them for profit; right?
22   A  Sure.
23   Q  Now, before we had talked about how you sell
24 parts.  And I think I said, "Well, somebody" -- "you
25 offer things for sale," and you said, "No, no, no.

## Page 99

1 People call us when they want a part."
2     I don't need you to remember that exact
3 testimony, but just to get you in the right frame of
4 mind.
5     Do you have a catalog that you publish that
6 has the parts that you have available?
7   A  Yes, but it's really old.
8   Q  Do you have one electronically?
9   A  I don't know if you could call it a "catalog,"
10 but we have that data.
11     MR. LORELLI:  Let me mark as Exhibit 15
12 some documents from a file from yours called "2012 June
13 Wholesale Catalog, All Pricing."
14     (Tsai Exhibit 15 was marked.)
15   Q  BY MR. LORELLI:  Can you tell us what this is?
16   A  This appears to be LKQ Keystone's catalog.
17   Q  Do you know why it would be in your production?
18   A  I'm not sure.  I don't know what specifically
19 would have grabbed that but --
20   Q  And how do you know that it's LKQ Keystone
21 catalog?
22   A  Well, it has a "Northeast List," "National
23 List," and "Wholesale Price Call," which is
24 highlighted -- the highlighted column.
25   Q  Um-hum.

## Page 100

1   A  And then the part number is -- at the end of
2 some of these parts have "DSN," which is "Diamond
3 Standard NSF."
4   Q  So this is how LKQ tells people what's
5 available; is that right?
6   A  I'm sure this is one of them.
7   Q  Okay.  How does New World let people know what's
8 available for purchase?
9   A  Customers call and ask.
10   Q  Any other way?
11   A  I mean, we've had a catalog that's really old
12 but --
13   Q  When you say "really old," how old?
14   A  Don't quote me.  I'm not sure.  But 2010/2011
15 maybe.
16   Q  Okay.  So for the last five years, the only way
17 you've been letting people know that you have parts
18 available to sell is if they call you?
19   A  I mean, our marketing is direct marketing.  We
20 visit customers and we tell them we have aftermarket auto
21 body parts available for sale.
22   Q  But you don't have a listing of what you have
23 available for sale that you can give to them?
24   A  They're like -- we carry, like, 40- or 50,000
25 SKUs, Marc.



JOSEPH TSAI
January 3, 2017

## Page 129

1    A   Yes, sir.

2    Q   We talked about that a little bit today?

3    A   Yes, sir.

4    Q   Is your defense patent exhaustion, or is it the

5    repair or reconstruction doctrine, or do you not know?

6    A   I don't know.

7    Q   Okay.

8    A   I just know that patent exhaustion, through

9    implied license, that when a consumer purchases a

10   vehicle, he has the right to repair that vehicle.

11   Q   Number 1 is -- it says:  "Invalidity for lack of

12   ornamentality and functionality."

13       Do you see that?

14   A   Yes, sir.

15   Q   And we talked about functionality earlier.

16       Do you have a contention that Ford's designs

17   lack ornamentality?

18   A   I think their design is functional.

19   Q   Right, but do you have a contention that they --

20   A   The function is its design.

21   Q   I understand.  And that's functionality, and we

22   talked about that at length.

23       Do you have a contention that Ford's designs

24   lack ornamentality, different and apart from what you had

25   talked about before?

## Page 130

1    A   I'm not sure how to answer that question.  But I

2    don't know how your question is different from my answer

3    to -- does that make sense?

4    Q   Well, perhaps this -- you're not saying that

5    Ford designers didn't come up with an ornamental design

6    when they set out to design parts; right?  Your position

7    is that the design of those parts is functional; is that

8    fair?

9    A   Yes.  The design of that part has to mate and

10   fit with the surrounding parts of the vehicle in order to

11   function properly as that hood.

12   Q   Not that Ford designers didn't do any

13   ornamentality in their design; is that right?

14   A   I know what an ornament is, but I'm not entirely

15   sure when you say "ornamentality," what that means.

16   Q   Aesthetically pleasing.  Ford designers set out

17   to make an aesthetically pleasing design for those parts;

18   right?  You're not saying that they failed at that, are

19   you?

20   A   I don't know that I am or am not.  But the

21   vehicle -- the hood or the bumper cover has to fit on the

22   vehicle in that specific way and mate with it in order to

23   be aesthetically pleasing.

24   Q   But that hood or bumper cover is aesthetically

25   pleasing in that fashion?

## Page 131

1    A   I don't know --

2    Q   What I'm trying to figure out is whether --

3    A   -- that the hood by itself is attractive.

4    Q   You're able to sell them?

5    A   But the purpose of the customer buying them from

6    us is to put them on that specific vehicle.

7        MR. LORELLI:  Why don't we take a short

8    break and just let me check.

9        THE WITNESS:  Okay.

10       THE VIDEOGRAPHER:  We're off the record at

11   4:24 p.m.

12       (Recess from 4:24 p.m. to 4:30 p.m.)

13       THE VIDEOGRAPHER:  We're back on the record

14   at 4:30 p.m.  Please continue.

15   Q   BY MR. LORELLI:  Mr. Tsai, do you know where

16   Ms. Zimmerman is currently -- is she currently employed?

17   A   Yes, sir.

18   Q   Where -- whereabouts, if you know?

19   A   She works with CARSTAR.

20   Q   What is it?

21   A   CARSTAR.

22   Q   What's CARSTAR?

23   A   I believe they're an auto body repair collision

24   shop.

25   Q   Is that in the Dallas area here?

## Page 132

1    A   They have locations in the Dallas area.

2    Q   Is it -- is it true that large amounts of UCC

3    inventory could not be accounted for in recent years?

4    A   Yes.

5    Q   And is it true that 2 million -- almost

6    $2 million of inventory had been manually written off or

7    altered in your computer systems?

8    A   I don't know about $2 million, but a good

9    amount.

10   Q   Do you have any ability to vouch for the

11   accuracy of your computer records?

12   A   Some.

13   Q   In fact, sales of parts have been erased from

14   your computer records; right?

15   A   I don't know about that.

16   Q   Could certain employees erase records of

17   inventory from your system?

18   A   Yes.

19   Q   Is that a problem?  Did they --

20   A   I don't know that it's a problem.

21   Q   Did that create a problem for you?

22   A   Well, where are you coming from?

23   Q   If employees could arbitrarily erase records of

24   inventory and sales from your records, does that cause a

25   problem for you in your accounting?



JOSEPH TSAI
January 3, 2017

---

Page 133

1      A   Yes.
2      Q   And that, in fact, happened at UCC; right?
3      A   You're going to have to be more specific.  Can
4   you --
5      Q   In recent years, has that happened?  Yes or no?
6      A   Has someone deleted --
7      Q   Sales and inventory records.
8      A   I don't know that anybody's deleted sales
9   records, but maybe inventory records.
10     Q   To the tune of $1.8 million worth?
11     A   Deleted?
12     Q   Yes.
13     A   Can you show me what you're referring to?
14     Q   As you sit here today, sir, can you testify --
15   well, strike that.
16            No, as you sit here today, can you testify
17   that your records -- your sales and inventory records are
18   accurate?
19     A   I think they're reasonably accurate.
20     Q   Even though you've complained to a court that
21   $1.8 million of inventory had been modified by an
22   employee?
23     A   Can I look at what you're referring to?
24     Q   Does this not ring a bell to you at all, sir?
25     A   That amount sounds really high, but I would like

---

Page 134

1   to look at the document.
2            MR. LORELLI:  No further questions.
3            THE WITNESS:  Thank you.
4            MR. LORELLI:  Thank you.
5            MR. OAKE:  Okay.  We'll -- we'll reserve
6   our questions.
7            THE VIDEOGRAPHER:  We're off the record at
8   4:33 p.m.  This marks the end of Disc 2 of 2.
9            (Off the record at 4:33 p.m.)
10                   * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 135

1            I, JOSEPH TSAI, have read the foregoing
2   deposition and hereby affix my signature that same is
3   true and correct, except as noted above.
4
5            _____
6            JOSEPH TSAI
7
8
9
10   THE STATE OF _____ )
11   COUNTY OF _____ )
12            BEFORE ME, _____, on this
13   day personally appeared JOSEPH TSAI, known to me (or
14   proved to me under oath of _____ or
15   through _____) (description of
16   identity card or other document) to be the person whose
17   name is subscribed to the foregoing instrument and
18   acknowledged to me that they executed the same for the
19   purposes and consideration therein expressed.
20            Given under my hand and seal of office this ____
21   day of _____, 2017.
22
23            _____
24            NOTARY PUBLIC IN AND FOR
            THE STATE OF _____
            MY COMMISSION EXPIRES:
25            _____

---

Page 136

1   COUNTY OF DALLAS
2   STATE OF TEXAS
3
4            REPORTER'S CERTIFICATION
5
6            I, REBECCA A. GRAZIANO, Certified Shorthand
7   Reporter in and for the State of Texas, hereby certify
8   that this transcript is a true record of the testimony
9   given and that the witness was duly sworn by the officer.
10           I further certify that I am neither attorney nor
11   counsel for, related to, nor employed by any of the
12   parties to the action in which this testimony was taken.
13   Further, I am not a relative or employee of any attorney
14   of record in this cause, nor do I have a financial
15   interest in the action.
16           Subscribed and sworn to on this the 9th day
17   of January, 2017.
18
19            _____
20            Rebecca A. Graziano, CSR, RPR, CRR
            Texas CSR No. 9306
            Expiration Date:  12/31/17
21
22
23
24
25

---