AUTOMOTIVE BODY PARTS
ASSOCIATION,

     Plaintiff,

v.

FORD GLOBAL TECHNOLOGIES, LLC,

     Defendant.

Case No. 2:15-cv-10137
Honorable Laurie J. Michelson

---

**OPINION AND ORDER
DENYING FORD'S MOTION TO DISMISS THE CASE AS MOOT [61] AND
DENYING THE ABPA'S MOTION FOR SUMMARY JUDGMENT [39]**

---

The Automotive Body Parts Association effectively asks this Court to eliminate design patents on auto-body parts. Members of the ABPA import, make, and sell auto-body parts that are used to repair cars and trucks damaged in a collision. Ford Global Technologies, LLC holds a large portfolio of patents that protect the designs for body parts for Ford vehicles. The ABPA, on behalf of its members, filed this lawsuit asking this Court to declare that two of Ford's patents protecting the design of two F-150 body parts are either invalid or unenforceable. But the ABPA's arguments are not specific to those two patents. Instead, the ABPA argues that designs for auto-body parts are simply not eligible for patent protection because consumers seeking to repair their vehicles do not select body parts for their design and because the designs were dictated by the body parts' function. In the alternative, the ABPA says that patents protecting the designs of auto-body parts are unenforceable against its members because the patent rights are exhausted upon the first authorized sale of the vehicle.

The ABPA now seeks summary judgment. (R. 39.) It asks this Court to declare as a matter of law that two of Ford's design patents are invalid or unenforceable. The Court has carefully considered the parties' arguments made not only in this case but in a related case presenting the same invalidity and unenforceability questions. Having done so, the Court finds that the ABPA has not shown that Ford's designs for an F-150 hood and headlamp are not eligible for design patent protection and has not shown that Ford's patent rights to those designs are exhausted when Ford sells an F-150 truck.

## I.

### A.

Plaintiff Automotive Body Parts Association is an association of companies that distribute automotive body parts. (*See* R. 2, PID 10–11.) Members of the ABPA sell auto-body parts to collision repair shops or even directly to vehicle owners.

Defendant Ford Global Technologies, LLC owns a portfolio of well over a hundred patents protecting the designs for auto-body parts. (*See* R. 62, PID 1253–1321.) Two are at issue in this case: U.S. Patent No. D489,299 and U.S. Patent No. D501,685. The '299 patent protects the design for a Ford F-150 hood and the '685 patent protects the design for an F-150 headlamp:



'299 patent, Fig. 1.



'685 patent, Fig. 2.

### B.

It appears that the first significant dispute between Ford and the ABPA arose in 2005. That year, Ford filed an action with the United States International Trade Commission against

seven members of the ABPA. (R. 68, PID 1453, 1585.) Ford initially accused these ABPA members of infringing 14 of its design patents for auto-body parts, including the two at issue in this case. (*See* R. 68, PID 1585.) Ford later dropped those two patents from the ITC action. The ITC action (and a second one) settled in 2009, with Ford granting a single ABPA member, LKQ Corporation, the exclusive right to sell auto-body parts protected by Ford's design patents. (*See* R. 62, PID 1329.)

As relevant to this case, things between Ford and the ABPA remained relatively quiet until 2013, with Ford sending only two cease-and-desist letters to ABPA members in 2011 and 2012. (*See* R. 68, PID 1466, 1471.) But in 2013, the tension between Ford and ABPA member New World International, Inc. escalated. (R. 62, PID 1250.) Ford wrote to New World, "We purchased several articles from New World International that are covered by Ford design patents[.]" (R. 62, PID 1260.) Ford referenced one of the design patents at issue in this case, the '299 patent. (*Id.*) Ford asked New World to "refrain from importing or selling parts covered by Ford design patents." (R. 62, PID 1251.) New World did not comply (or at least that is what Ford thought), so in November 2013, Ford sent New World another letter. The second letter warned that if New World did not stop offering certain auto-body parts on its website, Ford "w[ould] be forced to consider all avenues available to protect and enforce its intellectual property rights." (R. 61, PID 1245.)

Less than two weeks after Ford's November 2013 letter, the ABPA filed this lawsuit in the Eastern District of Texas. *See Auto. Body Parts Assoc. v. Ford Global Techs.*, No. 13-00705 (E.D. Tex. filed Nov. 25, 2013.) The ABPA asked the federal court in Texas to declare six of Ford's design patents, including the '299 and the '685 patents, invalid or unenforceable.

A few months later, Ford challenged the ABPA's standing to seek such relief. One way for an association to have standing to sue is for the association to satisfy the *Hunt* test: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). In September 2014, the federal court in Texas found that the ABPA had satisfied this test. *Auto. Body Parts Ass'n v. Ford Glob. Techs., LLC*, No. 4:13-CV-705, 2014 WL 4652123, at *8 (E.D. Tex. Sept. 17, 2014). As to the first *Hunt* requirement, the court found that "in its cease and desist letters, Ford accused New World of infringing the design patents, which is sufficient to establish that New World would have standing in its own right to bring an action for declaratory judgment against Ford." *Id.* at *8.

Following that determination, the ABPA amended its complaint. Instead of seeking a declaration that six of Ford's design patents for auto-body parts were invalid or unenforceable, it only sought that declaration as to the '299 and '685 patents. (*See* R. 2.)

In January 2015, the federal court in Texas transferred the case to the Eastern District of Michigan and it was assigned to this Court's docket. (*See* R. 1.)

Just two weeks later, Ford filed a separate lawsuit against New World in the Eastern District of Michigan. *Ford Global Techs., LLC v. New World Int'l, Inc. et al.*, No. 15-10394 (E.D. Mich. filed Jan. 29, 2015). Ford initially accused New World of infringing the two patents at issue in this case along with several others. Like in the ITC action, Ford later dropped its claims that New World had infringed the two patents at issue here. Ford's case against New World was reassigned to this Court's docket as a companion to this case.

## C.

In October 2016, the ABPA filed the motion for summary judgment now pending before this Court. (R. 39.) According to the ABPA, the '299 and '685 patents are invalid because they do not protect ornamental designs and they are unenforceable against ABPA members because when Ford sells an F-150 truck, its patent rights in the design of the truck's hood and headlamp are exhausted. (*See* R. 39, PID 566.)

That same month, New World, which is represented by the same counsel as the ABPA, filed for summary judgment in the companion to this case. New World essentially made the same invalidity and unenforceability arguments as did the ABPA. Although New World subsequently withdrew that motion, Ford then filed a mirror-image motion for summary-judgment: it claimed that its design patents were *not* invalid for failing to protect ornamental designs and that they were *not* unenforceable under the doctrine of exhaustion. Given that ABPA's motion in this case and Ford's in the companion addressed the same two issues, the parties agreed that the Court should consider the arguments presented in all the briefs in both cases in deciding both motions.

While this Court was in the midst of drafting its opinion on the two motions, a threshold issue arose in each case. The first was a result of *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S. Ct. 1514 (2017). There, the Supreme Court held that a corporation can be sued for patent infringement only in its state of incorporation. *See id.* at 1517. New World's was Texas. So this question arose: should Ford's suit against New World remain in the Eastern District of Michigan?

The other threshold issue involved this case. Although it had made similar statements earlier, in its summary-judgment briefing, Ford made clear that it was not accusing New World of infringing the two patents at issue in this case. (*See* R. 54.) As noted above, under *Hunt*, the

ABPA's standing to seek a declaratory judgment was premised on New World's standing to do so. So the Court asked the parties to brief the issue of mootness. (*See* R. 54.) In that briefing, Ford went a step further: it offered a covenant never to sue New World (and a few others) for infringing the '299 and '685 patents. (*See* R. 61, PID 1104.) So this question arose: is this case moot?

The Court has already answered one of the two threshold questions. In particular, the Court found that under *TC Heartland*, the Eastern District of Michigan was not the proper venue for Ford's suit against New World and that New World had not waived the defense of improper venue. *See generally Ford Glob. Techs., LLC v. New World Int'l Inc.*, No. 2:15-CV-10394, 2017 WL 5635451 (E.D. Mich. Nov. 7, 2017). The Court thus transferred Ford's infringement case to the Northern District of Texas. *See Ford Glob. Techs., LLC v. New World Int'l Inc.*, No. 3:17-cv-03201-N (N.D. Texas filed Nov. 22, 2017.) Ford's summary-judgment motion—the one that mirrors the one the ABPA asks this Court to decide—remains pending before the federal court in Texas.

## II.

The Court now turns to the other threshold issue: whether this case is moot.

On the surface, it seems so. Based on the covenant it has offered and associated representations it made at oral argument, Ford is willing to irrevocably commit to never suing New World (and three other entities) for infringing the two patents at issue in this case, the '299 and '685 patents. (*See* R. 63, PID 1104, 1348.) And, as explained, the federal court in Texas found that the ABPA had standing in this case because Ford had sent New World cease-and-desist letters. In other words, the ABPA's standing to seek a declaration that the two patents-in-suit are invalid or unenforceable was built upon New Worlds' standing to do so. But now, Ford

has cut out that foundation by saying that it will never sue New World for infringing the two patents-in-suit.

But this case is not between New World and Ford—it is between the ABPA and Ford. And so if there is a case or controversy between another ABPA member and Ford, the ABPA could pursue declaratory relief premised on that member's ability to do so.

In examining this issue, the Court is mindful that after *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), "a declaratory judgment plaintiff does not need to establish a reasonable apprehension of a lawsuit in order to establish that there is an actual controversy between the parties." *See SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1384 (Fed. Cir. 2007). Instead a "more lenient legal standard," *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 902 (Fed. Cir. 2008), applies: "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment," *MedImmune*, 549 U.S. at 127.

Considering "all the circumstances," the controversy between Ford and National Autobody Parts Warehouse, an ABPA member, is *just* substantial and *just* immediate enough that an opinion on the merits of the ABPA's two defenses will not be advisory. It appears that NAPW is a middle-man in the auto-body parts distribution chain: it buys auto-body parts from manufacturers (or others more upstream than it) and then resells them to repair shops (or others more downstream than it). (*See* R. 69, PID 1678–80.) According to NAPW, manufacturers of the hood and headlamp covered by the two patents in this case have been told by Ford's exclusive licensee, LKQ, that if they manufacture the hood and headlamp for anyone but LKQ, they would "be subject to patent enforcement efforts by" Ford. (R. 69, PID 1680.) Notably, these

manufacturers are themselves ABPA members. (R. 69, PID 1680.) Thus, if Ford is willing to sue those ABPA members for selling the hood and headlamp to NAPW, it seems likely that Ford would sue NAPW if it, in turn, sold the hood and headlamp to collision repair shops or vehicle owners.

Of course, an Article III case or controversy cannot be based on a hypothetical—that NAPW might someday buy the hood and headlamp from a manufacturer and might someday sell it. But NAPW has averred that in the past, it purchased and sold a hood and a headlamp that Ford claims are covered by the two patents-in-suit. (R. 69, PID 1679.) And NAPW says it is "ready and willing" to do so now. (*Id.*) It has even asked Ford for a license to sell the hood and headlamp and was denied. (*Id.*) And it asked Ford's exclusive licensee to buy the hood and headlamp from it, but LKQ refused. (*Id.*) So, on this record, there is more than speculation that NAPW might sell the hood and headlamp. It has in the past, it wants to now, and has tried to obtain permission to do so.

The Court is aware that even under *MedImmune*'s less-stringent test it is not enough that NAPW subjectively believes that it would be sued for patent infringement if it purchased and then sold the hood and headlamp—there must be "some affirmative act" by Ford. *SanDisk*, 480 F.3d at 1380–81; *accord Asia Vital Components Co. v. Asetek Danmark A/S*, 837 F.3d 1249, 1253 (Fed. Cir. 2016). But there have been affirmative acts by Ford against ABPA members in the past: the ITC actions and the cease-and-desist letters. *See Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1341 (Fed. Cir. 2008) ("Prior litigious conduct is one circumstance to be considered in assessing whether the totality of circumstances creates an actual controversy."). And there is an affirmative act by Ford against an ABPA member right now: Ford's lawsuit against New World alleging infringement of the 13 design patents. Of course, Ford is not suing

New World for the two patents at issue in this case and has said it never will. But to the extent that this would quell NAPW's fear of suit should it purchase and sell the hood and headlamp, another fact heightens it: Ford has refused to extend the covenant to all ABPA members and NAPW specifically.

Thus, while a close call, the Court finds a sufficient case or controversy between Ford and NAPW. *MedImmune*, 549 U.S. at 127. And given that NAPW is an ABPA member, it follows that the ABPA may seek a declaration that the '299 and '685 patents are invalid or unenforceable.

## III.

The Court thus turns to the ABPA's motion for summary judgment.

## A.

Here too there is a threshold question: what is the ABPA's summary-judgment burden? At trial, an accused infringer must show that a design patent is invalid because it protects function rather than ornamentation by clear-and-convincing evidence. *See Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1328 (Fed. Cir. 2015). And, at trial, the accused infringer must show that a patent cannot be enforced against it by a preponderance of the evidence. *Jazz Photo Corp. v. United States*, 439 F.3d 1344, 1350 (Fed. Cir. 2006). Thus, the ABPA moves for summary judgment on issues it has the burden of proof on at trial, which would usually mean that the ABPA has the considerable summary-judgment burden of showing that *every* reasonable jury would find in its favor (clearly and convincingly or by a preponderance, as the case may be). *See Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012).

But the ABPA argues that whether a design is directed to function is a question of law (*See* R. 39, PID 579.) (Its position on exhaustion is less clear. (*See* R. 39, PID 580–81.)) It strikes the Court that even if the ultimate question is one of law, there are often underlying questions of fact. For example, whether there are alternative designs for the product that allow it to perform the same function is a question of fact. So to the extent that there are material factual disputes, it would seem that the ABPA would have the considerable burden of showing that every reasonable jury would resolve the material factual dispute in its favor. *See Hotel 71*, 778 F.3d at 601; *Surles*, 678 F.3d at 455–56.

Ultimately, the Court need not decide whether invalidity due to functionality and unenforceability due to exhaustion present pure questions of law or mixed questions of law and fact. The Court will assume in the ABPA's favor that it only needs to convince this Court that the two patents in suit are invalid or unenforceable. It may proceed this way because, as will be explained, the ABPA has not persuaded this Court to find in its favor and so it would follow that it has not persuaded the Court that *every* reasonable jury would find in its favor.

The Court now turns to the merits.

**B.**

The Court starts with the ABPA's claim that the '299 and the '685 patents are invalid. The Patent Act restricts design-patent protection to "ornamental" designs. *See* 35 U.S.C. § 171. The ABPA claims that the designs of the '299 and the '685 patents are not ornamental. The ABPA makes two main arguments in support of this claim: the designs of the two patents-in-suit are not "a matter of concern" and the two designs are "dictated by function." (*See* R. 39, PID 571–74; R. 51, PID 575–76; Case No. 15-10394, R. 104, PID 5586–87.) (The ABPA places its dictated-by-function argument under the matter-of-concern umbrella (*see* Case No. 15-10394, R.

104, PID 5585–86), but whether part of the matter-of-concern test or a separate test for patent eligibility, the dictated-by analysis is the same.)

The Court considers these two primary arguments in turn and then addresses ABPA's related policy arguments. None are convincing.

**1.**

The "matter of concern" approach to deciding whether a design is entitled to patent protection is based on a straightforward concept: if no one cares about a particular design, then the design is not deserving of patent protection. *See Application of Stevens*, 173 F.2d 1015, 1019 (C.C.P.A. 1949) ("It has been held repeatedly that articles which are concealed or obscure in normal use are not proper subjects for design patents, since their appearance cannot be a matter of concern."). An example of a design that is of no concern is the design for a rotary brush for a vacuum cleaner that, during its normal use, is concealed from view. *Id.* at 1019.

The ABPA argues that the designs of the '299 and '685 patents are not a matter of concern because when an F-150 is damaged (say in a crash), the owner simply wants the body parts that will return her F-150 to the way it looked when it was new. (R. 39, PID 572.) In other words, the ABPA says that the F-150 owner will not shop around and compare various hood designs; instead she will, in mechanistic fashion, simply order the hood that came with the truck when it came off the assembly line. (*See* R. 39, PID 573; Case No. 15-10394, R. 104, PID 5586–87.) In further support of this assertion, the ABPA claims that vehicle owners (or collision repair shops on the owner's behalf) "typically" order a replacement body part by part number and thus never even consider the part's design. (*See* R. 39, PID 573.) And, says the ABPA, insurance policies often only cover returning the vehicle to "its pre-loss operational safety, function, and appearance." (R. 39, PID 572, 660.) Thus, the ABPA implies that if the owner of an F-150 wants

her insurer to pay the repair costs, she needs to have her truck restored to the way it looked before the accident. (*See* R. 39, PID 572, 577; *but see* R. 39, PID 627.)

The ABPA has not established a necessary premise of its argument: that the "matter of concern" inquiry is constrained to the perspective of a vehicle owner *at the time* that she is buying a replacement body part, as opposed, for example, to the time she initially buys the truck. None of the ABPA's legal authorities—*Gorham Manufacturing Co. v. White*, 81 U.S. 511 (1871), the district court and Federal Circuit opinions in *Best Lock Corp. v. ILCO Unican Corp.*, or the district court and Sixth Circuit opinions in *Static Control Components, Inc. v. Lexmark Int'l, Inc.*—establish this premise. Moreover, there is authority to the contrary.

Starting with *Gorham*, the ABPA relies on this language: "[The acts of Congress which authorize the grant of patents for designs] manifestly contemplate[] that giving certain new and original appearances to a manufactured article may enhance its *salable value, may enlarge the demand for it*, and may be a meritorious service to the public." 81 U.S. at 524–25 (emphasis added). The Court agrees with the ABPA that the references to "salable value" and "demand" suggest that in deciding whether a design is entitled to patent protection, a court should take into account whether design plays a role in consumers' purchase decisions. (*See* Case No. 15-10394, R. 104, PID 5582–83.) But even if a consumer's valuation of the design is key to deciding whether the design is a matter of concern, it does not follow that it is only the consumer's perspective when she seeks to replace the product with the patented design that matters. After all, an article's design may have been the very reason the consumer bought the article in the first place. Or, at least, a reason.

The two *Best Lock* opinions also do not help the ABPA establish that the design of an auto-body part is a matter of concern only if it is a matter of concern when the auto-body part is

being replaced. The design patent in *Best Lock* covered a unique-looking key blade (the portion of a key that is inserted into a lock). 94 F.3d 1563, 1564–65 (Fed. Cir. 1996). Although the district court found that the blade's design was not "a matter of concern to a purchaser," it did so by finding that the design of the blade was *never* a matter of concern to the purchaser: "Ornamentation, or the aesthetic quality of this design, is not a matter of concern during either the use of the product *or at the time the key or lock is purchased.* . . . There is no evidence that at *any time* in the commercial process the appearance of the cross-section of the key or keyway represented a matter of ornamental concern to the purchaser or the user." 896 F. Supp. 836, 843 (S.D. Ind. 1995) (emphases added). In other words, the district court in *Best Lock* did not limit the matter-of-concern inquiry to when a lost key might need to be replaced (at which point design would obviously not be a matter of concern because the lock owner needs the one key that will open his lock). And, as will be discussed below, the Federal Circuit's holding did not depend on whether the key blade design was a matter of concern to purchasers. *See Best Lock*, 94 F.3d at 1566.

That leaves the ABPA with the two *Static Control* opinions. Neither establish the premise missing from the ABPA's matter-of-concern argument. *Static Control* involved a patent for the design of a toner cartridge. 697 F.3d 387, 421 (6th Cir. 2012). As in *Best Lock*, the district court in *Static Control* found that the appearance of the cartridges were "of no matter of concern during those cartridges' *entire existence*—beginning after completion of manufacture or assembly and ending with the ultimate destruction, loss, or disappearance of those cartridges." 487 F. Supp. 2d 830, 839 (E.D. Ky. 2007) (emphasis added). And the Sixth Circuit's reasoning largely tracked that of the district court. *See* 697 F.3d at 422.

In short, none of *Gorham*, *Best Lock*, or *Static Control* limit the matter-of-concern inquiry to the consumer's thought process when she is replacing an article with a patented design. As such, the ABPA has not established a necessary premise of its matter-of-concern argument.

And, in fact, there is binding precedent that strongly supports a finding that designs for auto-body parts pass the matter-of-concern test for patent eligibility. At issue in *In re Webb* was whether the design for an artificial femur was eligible for patent protection. 916 F.2d 1553, 1555 (Fed. Cir. 1990). The patent examiner and appeal board thought not, reasoning that the femur, once placed inside the body, would never be seen and thus its aesthetic was of no concern to anyone. *Id.* at 1556. The Federal Circuit rejected this argument. It acknowledged that "replacement items" (like a vacuum cleaner's rotary brush) are either sold by part number or at most viewed to assess whether they will do the job; thus, how these items look are of no concern to consumers. *Id.* at 1558. But the Federal Circuit pointed out that the design of other items (like a casket or artificial femur), while of no concern in their ultimate use, are of concern when marketed. *Id.* at 1558. Thus, the Court held, "the inquiry must extend to whether *at some point in the life of the article* an occasion (or occasions) arises when the appearance of the article becomes a 'matter of concern.'" *Id.* at 1557 (emphasis added).

*In re Webb* closes the door (or hood) on the ABPA's matter-of-concern argument. Even if Ford had not produced considerable evidence on the point (*see* Case No. 15-10394, R. 99, PID 4455–59), it is beyond reasonable debate that the design of an auto-body part is important to consumers at least when they are deciding which car to buy. In other words, the look of the vehicle matters or, in patent parlance, is a matter of concern.

**2.**

The ABPA also argues that the designs protected by the '299 and '685 patents are not "ornamental" under § 171 because the designs were "dictated by function."

Like the matter-of-concern test for design-patent eligibility, the dictated-by-function test captures a simple concept: if an article had to be designed a certain way for the article to function, then the design does not deserve patent protection. *See Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1328 (Fed. Cir. 2015)*. This is for two related reasons. One: the point of granting monopolies on designs is to encourage people to come up with innovative ones. *See* Donald S. Chisum, 8 *Chisum on Patents* § 23.03[4] at 23–38 (2016). But if a design was dictated by how the article works, then the design is more byproduct than innovation. *See Avia Grp. Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1563 (Fed. Cir. 1988) ("When function dictates a design, protection would not promote the decorative arts, a purpose of the design patent statute."), *abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008). Two: if a design patent could protect a design dictated by the article's function, then the holder of a design patent would effectively be granted a monopoly on the function without having to clear the hurdles for obtaining a *utility* patent, i.e., the monopoly on function would be unearned. *See* Chisum, *supra*, § 23.03[4].

The ABPA asserts that several functions dictate the designs covered by the '299 and '685 patents. For one, the ABPA says that the designs for the hood and headlamp are dictated by the need to physically fit onto the F-150, including mating with the surrounding body parts and connecting to the truck's frame. (*See* R. 39, PID 572; R. 51, PID 1031; Case No. 15-10394, R. 104, PID 5587.) For another, the ABPA says that the designs are dictated by the need to match the F-150's overall aesthetic. (*See* R. 39, PID 572; R. 51, PID 1031; Case No. 15-10394, R. 104,

PID 5587.) And the ABPA implies that insurance provisions and government regulations dictate the designs of the hood and headlamp. (*See* R. 39, PID 572.)

Taking this last point first, the cases the ABPA cites are inapposite. In *Application of Carletti*, 328 F.2d 1020, 1021–22 (C.C.P.A. 1964), the court did find that the gasket was designed to meet military specifications but it also found that the design was simply not for aesthetics: "[i]t seems naive in the extreme to believe that anyone would try to 'ornament' the rubber gasket on the under side of the bung cap for a gasoline drum." As for *Shop\*TV, Inc. v. Bed Bath & Beyond, Inc.*, No. 09CV00057, 2010 WL 427782 (D. Colo. Jan. 19, 2010), the district court later withdrew its adoption of that report and recommendation because the case settled. *See* 2010 WL 582165. And legal authority aside, ABPA has no evidence that insurance provisions or government regulations are so restrictive that auto manufacturers cannot chose how to design their trucks' hoods or headlamps. Indeed, a stroll through a used-car lot (or autotrader.com) reveals just the opposite.

The ABPA's aesthetic-functionality argument has more merit. Indeed, it has been accepted in trademark law. Take *Deere & Co. v. Farmhand, Inc.*, 560 F. Supp. 85 (S.D. Iowa 1982), for instance. There, John Deere's claim of trademark infringement rested in part on the fact that a competitor had painted its loaders—a bulldozer-like part that attaches to the front of a tractor—"John Deere green." *See id.* at 88–89. While farm-equipment consumers might well have associated the distinct shade of green with John Deere, the court found that the color could still not serve as a trademark because the color was aesthetically functional. *Id.* at 96–99. In particular, farmers testified that matching the loader's color with their tractor's color was an important factor in choosing which loader to buy. *Id.* at 91, 98. The ABPA implies that the situation in this case is similar: just like "John Deere green" allowed one part of the tractor (the

loader) to match the aesthetic of the tractor as a whole, Ford's designs allow the hood and headlamp to match the aesthetic of the truck as a whole. (*See* R. 39, PID 572; Case No. 15-10394, R. 104, PID 5588.)

For at least three reasons the Court declines to import the aesthetic-functionality doctrine from trademark law to design-patent law.

First, no court has done so. This despite that both trademarks and design patents have coexisted for well over a century.

Second, trademark law and patent law serve different purposes. By ensuring that a mark is associated with a particular source, trademark law simultaneously encourages the mark holder to make high-quality goods and discourages competitors from selling poor-quality goods under the guise of the mark. *See Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 164 (1995). In other words, "by protecting a firm's reputation," trademark law "seeks to promote competition." *Id.* at 164. In contrast, patents inhibit competition. *Schering-Plough Corp. v. F.T.C.*, 402 F.3d 1056, 1065–66 (11th Cir. 2005) ("By their nature, patents create an environment of exclusion, and consequently, cripple competition."); *see also Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 215 (1980); *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 893 (5th Cir. 2016). Yet the "policy predicate for the entire [trademark] functionality doctrine stems from the public interest in enhancing competition." *Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822, 827 (3d Cir. 1981).

Third, there is greater reason for trademark law to be concerned with functionality (aesthetic or otherwise) than design-patent law. If a trademark could protect function, the mark holder would gain a *perpetual* monopoly over the product's function without clearing the hurdles for obtaining *any* patent—utility or design. *See Qualitex*, 514 U.S. at 165; *Keene*, 653 F.2d at

824. In contrast, those seeking a design patent must clear at least some hurdles related to novelty. And the term of monopoly is limited to 15 years. Thus, the inequity of a design patent protecting the aesthetically functional aspect of an article is simply not as great as a trademark doing so.

In short, the ABPA has not persuaded the Court that a design is not entitled to patent protection if it performs an aesthetic function (like matching the aesthetic of a hood to the aesthetic of an F-150).

That leaves the ABPA's claim that the designs of the '299 and '685 patents are dictated by their need to physically fit the F-150. But the need for the hood and headlamp to mate with surrounding parts and truck frame only restricts the pool of available designs in a limited way. Those who buy trucks for their looks can imagine a dozen hood and headlamp designs that would physically fit the existing structure of the F-150. But one does not have to imagine because Ford has found real-life examples:

   

Performance Part          '685 patent, Fig. 2.          Performance Part          '299 patent, Fig. 1.

(Case No. 15-13094, R. 99, PID 4639–40, 4678–4707, 4714–29.) The fact that there are "performance parts," i.e., alternative hood and headlamp designs that both perform their intended function and fit the F-150, strongly suggests that the designs are not dictated by function. *See Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1329–30 (Fed. Cir. 2015) ("We have not mandated applying any particular test for determining whether a claimed design is dictated by its function and therefore impermissibly functional. We have often focused, however,

on the availability of alternative designs as an important—if not dispositive—factor in evaluating the legal functionality of a claimed design.").

The existence of performance parts also serves to distinguish this case from one of the ABPA's principle cases that the Court said it would revisit: the Federal Circuit's opinion in *Best Lock*. (*See* Case No. 15-10394, R. 104, PID 5590–92.) There, the patent holder argued that the design of the key blade was not dictated by function because there were "unlimited" key blade and corresponding lock designs. 94 F.3d at 1566. The Federal Circuit rejected this argument. It noted that the patent was not directed to key-and-lock combination but just a key blade. *Id.* And, said the Court, there was exactly one key blade that would physically fit the corresponding lock. *Id.* So the blade had to be designed as shown in the patent or it would not serve its intended function. *Id.* Here, the existence of performance parts demonstrates that the designs claimed in the '299 and '685 patents are not necessary for the hood and headlamp to perform their intended functions.

In short, the ABPA has not persuaded the Court that the designs of the '299 and '685 patents are dictated by function.

### 3.

That leaves the ABPA's policy-based arguments for invalidity.

For one, the ABPA claims that design patents are premised on a *quid pro quo*: in exchange for a monopoly on its design, the patent holder contributes to the decorative arts. (R. 39, PID 574–75.) The ABPA thinks that Ford has not kept up its end of the bargain because "design patent protection for automotive repair parts does not promote the decorative arts or provide other public benefits." (R. 39, PID 575.) But it appears that the basis for this last

statement is that auto-body part designs are dictated by function or of no concern to consumers. As the Court has rejected these two arguments, the policy argument must be rejected too.

The ABPA also says that if Ford is allowed to protect its designs for F-150 body parts it is allowed "double recovery": once when the truck is sold, and then again when the truck is repaired. (R. 39, PID 575.) But the ABPA has no evidence that the revenue Ford receives by selling (or licensing LKQ to sell) replacement body parts does not lower the initial sale price of the vehicle. In any event, if the designs are "ornamental" within the meaning of § 171, then it is for Congress, not this Court, to address any "double recovery" issues.

The ABPA further identifies a "practical problem that would arise if design patents on automotive repair parts are not held invalid." (R. 39, PID 576.) It refers to the fact that patents give their holders the right to exclude others from using the patented design so, if Ford wanted, it could decide not to sell any replacement body parts itself and further decide to preclude anyone else from doing so. (*Id.*) The result: "if an owner wants an original design, then the owner has to purchase a new vehicle." (*Id.*) But the ABPA offers no evidence to suggest that Ford has any plans to force its customers to purchase a new vehicle every time a customer's vehicle sustains significant body damage. And there are good reasons to think Ford has no such plans: General Motors, Toyota, Volkswagen, Nissan, Fiat-Chrysler, Honda, etc.

\* \* \*

In sum, the ABPA has not persuaded the Court (by clear and convincing evidence or otherwise) that Ford's design patents covering the F-150 hood and headlamp are invalid.

## C.

In the alternative, the ABPA argues that the '299 and '685 patents are unenforceable against ABPA members under the doctrine of patent exhaustion. The Court is unpersuaded.

Like the doctrines discussed so far, the patent exhaustion captures a relatively straightforward concept. Included in a patent holder's bundle of rights are the rights to exclude others from selling or using an item covered by her patent. *See* 35 U.S.C. §§ 154, 171. But when she sells (or authorizes another to sell) the patented item, she has reaped her reward, and so all patent rights to that one item are "exhausted." *See Bowman v. Monsanto Co.*, 569 U.S. 278, 283–84 (2013). In other words, the authorized sale "confers on the purchaser, or any subsequent owner, the right to use or sell the [item] as he sees fit." *Id.* at 283 (internal quotation marks and alteration omitted). And the purchaser's right to use the patented item includes the right to use it for its lifetime, *Adams v. Burke*, 84 U.S. 453, 455 (1873), so the doctrine of patent exhaustion also grants the purchaser of a patented item the right to repair it, *Standard Havens Prod., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1376 (Fed. Cir. 1991). And the right to repair the patented item "includes the right to purchase repair parts." *Standard Havens*, 953 F.2d at 1376.

For example, suppose a company holds a patent that covers a knitting machine (but has no patents covering any individual part of the machine). If the company sells the patented machine, the machine's owner can use the machine and, if it breaks, repair the machine without worry that he is violating the patent-holder's rights. *See Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1102–03 (Fed. Cir. 2001), *other grounds abrogated by Impression Prod., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523 (2017). And the machine's owner may even repair the machine by replacing worn out parts, say the knitting machine's needles, with new ones. *Cf. Wilson v. Simpson*, 50 U.S. 109, 125–26 (1850).

But exhaustion has its limits. The authorized sale of a patented item permits the owner to sell and use the one item that he purchased—not to make a replacement should that one item be destroyed. *See Bowman*, 569 U.S. at 283–84. In other words, "the [exhaustion] doctrine restricts

a patentee's rights only as to the 'particular article' sold; it leaves untouched the patentee's ability to prevent a buyer from making new copies of the patented item." *Id.* at 284 (internal citations omitted).

A second example helps illustrate this rule. In *Aiken v. Manchester Print Works*, a company held a patent that covered unique needles for a knitting machine. *See* 1 F. Cas. 245 (C.C.D.N.H. 1865). As the company's sale of a knitting-machine-with-needles bundle exhausted the company's patent rights to the needles, the purchaser of the bundle could use the needles and repair them (say by straightening out a bend). *Id.* at 247. But the *Aiken* court held that the purchaser of the bundle was not permitted to make replacement needles. *Id.* In reaching its conclusion that the machine could not be repaired by replacing worn out needles with new ones, the court explicitly distinguished the first example provided above, i.e., where a patent covered the knitting machine but no patent covered just the needles. *See id.* (distinguishing *Wilson v. Simpson*, 50 U.S. 109 (1850)). The Supreme Court long ago approved of the reasoning of *Aiken*, *see Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co.*, 152 U.S. 425, 434–36 (1894), and the Federal Circuit says that the venerable case is still the law, *see Helferich Patent Licensing, LLC v. N.Y. Times Co.*, 778 F.3d 1293, 1304 (Fed. Cir. 2015).

These settled rules and accompanying illustrations show that the ABPA's exhaustion defense fails as a matter of law. In the ABPA's view, when Ford sells an F-150, its rights in the '299 and '685 are exhausted. (R. 39, PID 583–84.) So, says the ABPA, when an F-150 is damaged in an accident, the owner of the F-150 has the right to repair it. (R. 39, PID 584.) Thus, according to the ABPA, the owner may replace the hood and headlamps on the vehicle by making new ones or by having new ones made for her. (*See* R. 39, PID 584–85.) The problem with the ABPA's argument is that the F-150 is just like the knitting machine in *Aiken* and its

hood (or headlamp) is just like the needles in *Aiken*. The patents at issue cover the design for those two parts—not the design for the truck as a whole—so while the authorized sale of an F-150 permits the owner to use and repair her hood and headlamp, it does not permit her to make unauthorized replacements or have replacements made for her.

The ABPA responds that *Aiken* involved a utility patent while this case involves design patents. And, says the ABPA, while utility patents are *for* an article of manufacture, design patents are *for a design for* an article of manufacture. *Compare* 35 U.S.C. § 101, *with* 35 U.S.C. § 171. Thus, the ABPA claims, while a utility patent can only protect an item, a design patent can protect the design for a *portion* of an item. (R. 51, PID 1034; Case No. 15-10394, R. 104, PID 5597); *see also Application of Zahn*, 617 F.2d 261, 268 (C.C.P.A. 1980) ("While the [patented] design must be embodied in some articles [of manufacture], the statute is not limited to designs for complete articles[] or 'discrete' articles[.]"). From the ABPA's perspective then, a patent protecting a design for one item "is the same as" a patent protecting the design for a portion of a larger item that includes the other item. (R. 39, PID 589; Case No. 15-10394, R. 104, PID 5600.) As applied to this case, while the '299 and '685 patents protect the design for the hood and headlamp for an F-150, that is the same as protecting the design for a *portion* of the F-150. (*See id.*) According to the ABPA, this is different than in *Aiken* where the patent at issue protected an item, i.e., the needles. (*See id.*) And, says the ABPA, this difference means that exhaustion permits repair of the F-150 (not just repair of the hood and headlamps), including by replacing the truck's hood and headlamps. (*See id.*)

There is no case dividing patent law this way—i.e., creating separate exhaustion doctrines for utility and design patents. Indeed, in *Aiken*, the needles were not only their own item but also a necessary part of another: the knitting machine. And so while the needle patent

could be viewed as covering one entire item (a needle), it could also be viewed as covering a *portion* of an item that incorporates the other (the knitting machine).

And if there were a case where the ABPA's distinction would warrant creating separate exhaustion doctrines for utility and design patents, this is not that case. Like the multi-component machine with a patented part in *Aiken*, the F-150 body is comprised of multiple components with patented parts. This is not a case dealing with a unitary vehicle body, a portion of which is protected by a design patent. In the event of an accident, F-150 owners do not need to replace the entire vehicle body as if it were a one-piece shell. They can instead replace separate body parts. But, as in *Aiken*, they must do so subject to Ford's patent rights on those parts.

In short, under the long-standing limits on the doctrine of patent exhaustion, the mere purchase of an F-150 does not convey to the owner the right to make new auto-body parts covered by Ford's design patents. It follows that the owner lacks the right to have those parts made for her by ABPA members. The ABPA's exhaustion defense thus fails as a matter of law.

## IV.

For the foregoing reasons, the Court finds that this case is not presently moot and thus DENIES Ford's motion to dismiss (R. 61). The Court further finds that the ABPA has not shown that U.S. Patent Nos. D489,299 and D501,685 are invalid because the designs they protect fall outside the scope of 35 U.S.C. § 171 or that those two patents are unenforceable against ABPA members because they become exhausted when Ford sells F-150 trucks. It follows that the ABPA's motion for summary judgment (R. 39) is DENIED.

Moreover, having considered two full sets of briefing on the ABPA's two affirmative defenses, which is the entirety of the ABPA's declaratory-judgment complaint, the Court intends to enter judgment in favor of Ford for the reasons set forth in this opinion and pursuant to Rule

56(f)(1). While Ford has not moved for summary-judgment in this case, it has in the case that was formerly before this Court and now pending before a federal court in Northern Texas. And New World—which is represented by the same counsel as the ABPA—responded to that motion and, at the parties' urging, this Court considered that response and addressed those arguments in writing this opinion. Discovery in this case closed over a year ago (R. 35, PID 551), and both parties' have indicated, if not outright said, that ABPA's two defenses could be decided as a matter of law. The Court thus sees no basis for further argument on the ABPA's claims of invalidity and unenforceability.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
Dated: February 20, 2018                    U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 20, 2018.

s/Keisha Jackson
Case Manager